## In re GLOBAL CROSSING SECURITIES AND ERISA LITIGATION

### No. 02 MD 1472(GEL).

United States District Court,
S.D. New York.

Nov. 24, 2004.

Derek W. Loeser, Lynn L. Sarko, Keller, Rohrback, LLP, Seattle, WA, for Donald Yancy, Jagdeo Ramkissoon and Scott Johnson.

## OPINION AND ORDER

LYNCH, District Judge.

Plaintiffs, Settling Defendants [1]—former officers, directors, and employees of Global Crossing Ltd. ("GCL") and Asia Global Crossing Ltd. ("AGC") (collectively "GX")— and the law firm Simpson Thatcher & Bartlett LLP ("STB") [2]—have submitted for this Court's approval an approximately $325 million partial settlement of litigation stemming from alleged accounting improprieties resulting in the artificial inflation of the price of GCL and AGC stock. After the Court held a fairness hearing, and the parties modified the preliminarily-approved settlement, this partial settlement was approved by order entered on November 10, 2004. This opinion sets forth the reasoning underlying that order. As will be further explicated below, the partial settlement was approved because it is fair, reasonable, and adequate.

## BACKGROUND

GCL is a telecommunications company that filed for bankruptcy protection on January 28, 2002. GCL's majority-owned subsidiary, AGC, filed a separate bankruptcy peti-

tion on November 17, 2002. In the wake of GCL's (and later AGC's) bankruptcy filing, scores of plaintiffs across the country filed putative class-action and individual lawsuits alleging violations of the federal securities laws, the Employee Retirement Income Security Act of 1974 ("ERISA"), and other laws. On September 6, 2002, the Judicial Panel on Multidistrict Litigation (the "MDL Panel") centralized all pending and future GX-related cases before this Court. *In re Global Crossing Ltd. Sec. & ERISA Litig.*, 223 F.Supp.2d 1384, 1385–86 (J.P.M.L.2002).

This litigation consists of more than 50 consolidated securities putative class actions, 15 consolidated putative class actions alleging violations of ERISA, and two other coordinated ERISA putative class actions. The Court has described aspects of this consolidated class action in previous opinions, but repeats here the story of the litigation insofar as it is pertinent to the approval of the settlement.

### I. *The Securities Action*

On December 12, 2002, this Court consolidated the numerous securities putative class actions and appointed the Public Employees' Retirement System of Ohio ("PERS") and the State Teachers' Retirement System of Ohio ("STRS") as Securities Lead Plaintiffs, and Grant & Eisenhofer, P.A., as Securities Lead Counsel. The Court also appointed an Executive Committee composed of counsel for certain other securities plaintiffs. *In re Global Crossing Ltd. Sec. & ERISA Litig.*, No. 02 MD 1472(GEL) (S.D.N.Y. December 13, 2002). Subsequently, on January 28, 2003, Securities Lead Plaintiffs filed their Consolidated Complaint against former GCL officers, directors, and employees, as well as

1. Settling Defendants Gary Winnick, Dan J. Cohrs, John L. Comparin, Linda Woodruff, Kenneth P. Schirmuhly, William S. Cohen, David L. Lee, James F. McDonald, Barry Porter, Abbott L. Brown, Lodwrick M. Cook, John M. Scanlon, Hillel Weinberger, James C. Gorton, Joseph P. Clayton, Robert Annunziata, Leo J. Hindery, Jr., Thomas J. Casey, David A. Walsh, William B. Carter, Jr., S. Wallace Dawson, Jr., John A. Scarpati, John M. Finlayson, Jay R. Bloom, Dean C. Kehler, Jay R. Levine, William D. Phoenix, Bruce Raben, Geoffrey J.W. Kent, Eric Hippeau, Douglas H. McCorkindale, William E. Conway, Jr., K. Eugene Shutler, Joseph P. Perrone, Mark Attana-

sio, Thomas U. Koll, Pieter Knook, Maria Elena Lagomasino, John J. Legere, Stefan C. Riesenfeld, Steven J. Green, Walter Beran, and Anthony Christie are former officers, directors, or employees of GCL or AGC. The Settling Defendants also include GKW Unified Holdings LLC, the Winnick Family Foundation, and Pacific Capital Group, Inc., which are affiliated with Winnick, as well as certain other described entities. (Agmt. § I.E.1.hhhhhhhhh, at 80.)

2. STB is not a named defendant in any of the Actions but is a Releasee under the Settlement Agreement. (Agmt. § I.E.1.jjjjjjj, at 65.)

against GCL's former accountants, underwriters, banks, and analysts, alleging various claims under sections 10(b), 14(a), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and sections 11, 12(a), and 15 of the Securities Act of 1933 (the "Securities Act"), on behalf of a proposed class of all persons and entities who had purchased or otherwise acquired Global Crossing securities from February 1, 1999, through January 28, 2002.

· Five securities putative class actions that were filed on behalf of AGC shareholders against many overlapping defendants and other former officers and directors of AGC were also transferred by the MDL panel to this Court. On May 29, 2003, the Court consolidated the 5 AGC cases with the GCL cases for all purposes. At that time, the Court also appointed lead counsel for AGC plaintiffs. *In re Global Crossing Ltd. Sec. & ERISA Litig.*, No. 02 MD 1472(GEL) (S.D.N.Y. May 29, 2003).

On August 11, 2003, the Securities Lead Plaintiffs filed an Amended Consolidated Securities Class Action Complaint, mostly to add AGC-related allegations into the consolidated securities action. On March 22, 2004, the securities plaintiffs filed a Second Amended Consolidated Securities Complaint (the "Second Amended Complaint") to update factual allegations based on continuing investigations into their claims and to conform their pleadings to the Court's ruling on the GCL underwriters' motion to dismiss, *In re Global Crossing Ltd. Sec. Litig.*, 313 F.Supp.2d 189 (S.D.N.Y.2003). The Second Amended Complaint added allegations of violations of common law and state securities laws and, as to the Settling Defendants, expanded the putative class definition to include all persons who had purchased or otherwise acquired Global Crossing Securities

3. The claims against GCL, however were subject to the automatic stay of proceedings against the debtor under the Bankruptcy Code.

4. The *Pusloskie* Plaintiffs filed their First Amended Complaint (the "*Pusloskie* Complaint") on November 26, 2002 against many of the same defendants (and others) named in the ERISA Consolidated Complaint. This Complaint seeks relief to the Frontier Group Bargaining Unit Employees' Retirement Savings Plan and to plan participants for alleged fiduciary breaches.

from February 1, 1999, through December 8, 2003.

## II. *The ERISA Action*

In its December 13, 2002, Consolidation Order consolidating the GCL securities cases, the Court simultaneously consolidated into the ERISA Consolidated Class Action 15 ERISA putative class actions filed on behalf of present or former GX nonunion employees who had purchased or held GCL securities through their 401(k) retirement-savings plans, and appointed an ERISA Lead Counsel Committee. In addition, the Court decided to coordinate—but not consolidate—two other ERISA putative class actions with the ERISA Consolidated Class Action: the *Pusloskie* Class Action, which was filed on behalf of participants in GCL's retirement-savings plans for unionized employees, and the *Simonetti* action, which was filed on behalf of participants in GCL's change-of-control severance plan.

On January 28, 2003, the ERISA Consolidated Plaintiffs filed their Consolidated Amended Master Class Action Complaint (the "ERISA Consolidated Complaint") against numerous former GCL directors, officers, and employees and against GCL itself.[3] On behalf of participants in GCL's retirement-savings plans, the ERISA Consolidated Complaint asserts claims for breaches of fiduciary duty, and seeks an award of damages to the Global Crossing Employees' Retirement Savings Plan and to the class members to compensate for the plan's losses, a constructive trust for amounts by which the defendants allegedly were unjustly enriched, and other equitable and monetary relief.[4]

## III. *Settlement Negotiations*

By the request of plaintiffs' counsel, in March 2003, in the early stages of the even-

On June 11, 2003, the *Simonetti* Plaintiffs filed their Amended Class Action Complaint (the "*Simonetti* Complaint") against the Frontier Corporation/Global Crossing Change of Control Severance Plan (the "Change of Control Severance Plan") and various persons who allegedly had responsibility for the plan. The Complaint seeks to reinstate benefits under the plan and to obtain damages and other equitable relief.

tually substantial discovery process,[5] the Court appointed Magistrate Judge Michael H. Dolinger to help with the settlement process. Beginning in May 2003, Judge Dolinger held extensive mediation sessions with counsel for the securities and ERISA plaintiffs, the Settling Defendants, and GX's insurers. The Court is deeply grateful to Judge Dolinger for his tireless efforts to help the parties to arrive at a fair settlement.

On March 19, 2004, after nearly a year of negotiations, counsel for the various Classes, the Settling Defendants, and STB signed a Stipulation of Settlement, which was conditioned on the completion of further discovery, among other conditions. At that time, the Court preliminarily approved the proposed partial settlement, subject to the following conditions: notice to the class, an opportunity for class members to object to the proposed settlement (or to exclude themselves from the securities settlement class altogether), and a final hearing. The agreement was amended in July 2004, primarily to address certain issues raised by the United States Department of Labor ("DOL").

## IV. *GX's Insurance Coverage*

GX has three types of insurance policies potentially applicable to the Actions: (i) five directors' and officers' ("D & O") insurance policies issued by United States carriers, (ii) a fiduciary-insurance policy issued by a United States carrier, and (iii) a multi-part insurance policy issued by an Isle of Man company called Pender Insurance Limited ("Pender"). (Declaration of Ann Ashton, dated June 28, 2004 (the "Ashton Decl."), ¶ 4.)

The D & O insurance coverage consists of an underlying $10 million policy with four excess layers of $10 million each, for a total of $50 million for the securities-related claims in the Actions. The D & O policies do not cover ERISA claims. (*Id.* ¶ 5.) The fiduciary-insurance policy, however, provides $25 million of coverage for the ERISA claims. (*Id.* ¶ 6.) These domestic policies were being consumed on defense costs in the Actions and in various related governmental investiga-

tions and other matters. As of March 19, 2004, only about $10 million of unexhausted coverage remained under GX's D & O policies, with another $22.3 million under the fiduciary policy. The rest of the domestic coverage—approximately $42.7 million—already had been spent on defense costs. (*Id.* ¶ 18.)

The Pender policy consists of six different sections covering separate but to some extent overlapping risks. Pender and the insureds disagreed about whether certain sections apply to the claims in the Actions. (*Id.* ¶¶ 7–8.) The Settling Defendants and Pender generally agreed that the D & O section provided £100 million of D & O coverage excess of the $50 million under the domestic D & O policies. (*Id.* ¶ 9.) The insureds and the plaintiffs asserted that other sections of the Pender policy, as well as the D & O section itself, provided additional coverage for the securities and/or ERISA claims in the Actions, but Pender disagreed. (*Id.* ¶ 10.) Consequently, Pender instituted a lawsuit and an arbitration in London seeking declarations that the policy did not provide any coverage applicable to the Actions except for the £100 million of excess D & O insurance. The Settling Defendants and Pender discussed the prospect of a comprehensive arbitration of all coverage issues and, at one point, scheduled such an arbitration. (*Id.* ¶¶ 11–12.)

For the settling parties, the disputes about the extent of coverage under the Pender policy created serious problems. First, because Pender claimed it was not subject to personal jurisdiction in the United States, and many (if not most or all) of the Settling Defendants claimed they were not subject to personal jurisdiction in England, the parties would have had to engage in lengthy jurisdictional skirmishes if they were to litigate their differences. (*Id.* ¶¶ 13–14.) Second, the Settling Defendants were not sure how they could pay for any litigation or arbitration with Pender, because the insurers might have viewed those prosecution and/or defense costs as outside the scope of coverage. Third, even if the parties were to surmount

---

**5.** Discovery was conducted throughout this action, starting in February and March 2003 and continuing through July 2004.

those other difficulties and reach the merits, both sides faced substantial risks of losing. Fourth, and perhaps most importantly, the Settling Defendants felt they could not afford to spend months or years litigating any of these matters, because the insureds risked losing all coverage under the Pender policy if they became enmeshed in protracted legal proceedings.

As the Pender policy is a "Programme"—a pool of coverage shared among as many as 100 different insured companies—delay for any reason could have jeopardized the Settling Defendants' ability to obtain even the apparently uncontested £100 million of excess D & O coverage. At least two companies other than GX already had filed notices with Pender asserting claims under the policy's D & O section. One of those other insureds was another large, then-bankrupt telecommunications company that (like GX) faced securities litigation. (*Id.* ¶¶ 15–16.) In other words, in light of the circumstances, the policy's first-come, first-served coverage significantly jeopardized the potential recovery at stake: if some other insured were to settle (or sustain a judgment) for the full coverage limit before the GX defendants could access it, the GX parties could be left with nothing.

In addition, the Settling Defendants were aware of uncertainties surrounding Pender's reinsurance of the coverage provided by the Pender policy. The settling parties feared that those uncertainties, as well as concerns that Pender itself might not have sufficient assets to pay the coverage owed under the policy, could result in the Settling Defendants' (and other insureds') being unable to collect whatever coverage might otherwise have been available. (*Id.* ¶ 17.)

The settlement negotiations, therefore, were heavily influenced by the parties' need to secure as much of the insurance money as soon as possible, before it was spent on further defense costs or was lost entirely.

## V. *The Settlement*

The over 200–page–long Settlement Agreement resulted from fourteen months of continuous negotiations among Securities Lead Counsel, Settling Defendants and their counsel, the insurers, and STB, and lengthy mediation sessions before Judge Dolinger.

### A. Settlement Negotiations

In January 2003, shortly after the Court had appointed lead counsel in the Actions, the parties began preliminary settlement discussions, which led to the plaintiffs' making a demand on certain of the Settling Defendants. The next month, plaintiffs asked the Court to appoint a Magistrate Judge to help the parties try to settle the cases before GX's insurance coverage was exhausted by defense costs or became unavailable for other reasons. In March 2003, the Court appointed Judge Dolinger to assist in the settlement process. Beginning in May 2003, Judge Dolinger held mediation sessions with counsel for the securities and ERISA plaintiffs, the Settling Defendants, and GX's insurers. These sessions—many of them in court, others by telephone—continued throughout 2003 and into 2004. The securities plaintiffs also held separate settlement negotiations with STB. Throughout these negotiations, plaintiffs' and defendants' counsel received advice from various consultants and experts, including experts in accounting and auditing issues and in estimating potential damages in securities fraud cases.

### B. Plaintiffs' Access to Discovery Materials

Even before filing their respective complaints, Securities Lead Plaintiffs and ERISA Plaintiffs had conducted extensive preliminary discovery. Securities Lead Plaintiffs interviewed nearly 100 former GX employees, reviewed documents provided to them by former GX employees, and analyzed certain publicly-available internal GX documents, including e-mails, memoranda, financial reports, and sales documents. ERISA Plaintiffs reviewed and analyzed similar materials and have interviewed former GX employees and participants in the employee-benefit plans.

Before they were appointed lead plaintiffs, Securities Lead Plaintiffs had moved for production of all documents that GX had produced to governmental agencies in investigations related to the conduct alleged in the Actions. At the December 10, 2002, hearing before this Court, ERISA Plaintiffs also sought discovery of documents relevant to

their ERISA claims. Plaintiffs' counsel further insisted they would need to review potentially relevant documents before serious settlement discussions could begin.

In February and March 2003, the settling parties entered into confidentiality agreements allowing plaintiffs' counsel to review the documents that GX had produced in the governmental inquiries. Those agreements were later extended to cover documents produced to the government in connection with investigations of AGC. The governmental productions shared with plaintiffs included some 270,000 pages of documents and 80,000 e-mails (with their associated attachments). The ERISA plaintiffs also received additional materials about the ERISA plans.

When the parties first executed the Stipulation of Settlement in March 2004, plaintiffs conditioned the agreement on their counsel's completion of additional discovery and on their conclusion, after such discovery, that the proposed settlement was in fact fair, reasonable, and adequate. (Agmt. § III, at 116–17.) Plaintiffs conducted that discovery as agreed. (Eisenhofer Decl. ¶ 74 (Liebesman Decl., Ex. C).)

### C. The Settlement Agreement

On March 19, 2004, counsel for plaintiffs, the Settling Defendants, and STB signed the original Stipulation of Settlement, which settles the Actions as to those defendants and releases claims against the Releasees.[6] The settling parties claim to have reached this agreement after considering (i) the substantial benefits that would accrue to the settlement-class members, (ii) the attendant risks, difficulties, and delays in litigation, especially in complex actions such as these, (iii) the bankruptcy petitions filed by GCL and AGC, and the consequences of the bankruptcy proceedings for any pre-petition claims against those companies, (iv) the importance of capturing the limited insurance proceeds that

otherwise would be dissipated through continued litigation or could be lost for other reasons, and (v) plaintiffs' and their attorneys' belief that the partial settlement is fair, reasonable, and adequate, and in the class members' best interests.

### D. Preliminary Approval of the Proposed Settlement

On March 19, 2004, the Court held a hearing to decide whether preliminarily to approve the proposed partial settlement and to authorize plaintiffs to send and publish notice to class members. The Court entered a Preliminary Approval Order that (among other things):

- preliminarily certified the four putative classes for settlement purposes—the securities class as an "opt-out" class under Fed.R.Civ.P. 23(b)(3), and the three ERISA Classes as mandatory, non-opt-out classes under Fed.R.Civ.P. 23(b)(1) and (b)(2) (Preliminary Approval Order ¶¶ 1–5);

- found the proposed partial settlement sufficiently fair, reasonable, and adequate to warrant sending notice to class members (*id.* ¶ 6);

- required the parties to submit a proposed form of notice within 30 days (*id.* ¶ 10);

- required publication of the notice (after approval) on the websites of Securities Lead Counsel, ERISA Plaintiffs' Counsel, and the Class Action Administrator, and required publication of a summary notice (after approval) in the newspapers identified in Exhibit C to the Settlement Agreement (*id.*);

- required the mailing of individual notice, the publication of summary notice, and the posting of the notice on the various websites no later than 45 days

---

**6.** The Releasees include "Global Crossing, each of the ERISA Plans and STB, and each of their respective past and present directors, officers, employees, members, partners, principals, agents, attorneys, advisors, trustees, administrators, fiduciaries (including, without limitation, independent fiduciaries in connection with any ERISA Plan), consultants, representatives, accountants and auditors, as well as the Insurers, including, without limitation, the Settling Defen-

dants and each of their respective estates, heirs, executors, agents, attorneys, accountants, trusts, trustees, administrators and assigns, entities owned by a Settling Defendant or in which a Settling Defendant has a Controlling Interest, Patrick Joggerst, Hank Millner, Susan Dullabh, Thomas Robershaw, Robin Wright, Jackie Armstrong, Brian Fitzpatrick and David Carey, and any representatives of any of the foregoing...." (Agmt. § I.E.1.jjjjjjj, at 65.)

before the Fairness Hearing (i.e., by June 8, 2004) (*id.* ¶¶ 10.a., 10.c., 10.d.);

- established procedures for class members to object to the settlement and for securities class members to exclude themselves from the securities class, and required objections to be filed and exclusion requests to be postmarked no later than 10 days before the Fairness Hearing (i.e., by July 13, 2004) (*id.* ¶¶ 13–15); and

- withdrew the reference to the Bankruptcy Courts handling the GCL and AGC bankruptcies as to certain matters relating to the insurance policies, and found preliminarily that the Insurers would not be acting in bad faith in exhausting the insurance policies to make the settlement payments (*id.* ¶¶ 7–8).

The Court's Preliminary Approval Order also defined the four settlement classes:

- The Securities Class consists of "all persons, entities, or legal beneficiaries or participants in any entities who, during the period from February 1, 1999 through December 8, 2003, inclusive . . ., purchased, sold, exchanged, acquired, disposed of, transferred, or made any other Investment Decision involving, Global Crossing Securities," subject to certain exceptions (*id.* ¶ 2).

- The ERISA Consolidated Class consists of "all individuals who were participants or had an interest in the Global Crossing Employees' Retirement Savings Plan at any time during the period from September 28, 1999 through December 8, 2003, inclusive," subject to certain exceptions (*id.* ¶ 3).

- The *Pusloskie* Class consists of "all individuals who were participants or had an interest in the Frontier Group Bargaining Unit Employees Retirement Savings Plan at any time during the period from September 28, 1999 through December 8, 2003," subject to certain exceptions (*id.* ¶ 4).

- The *Simonetti* Class consists of "all individuals who are or were participants, or who have or had an interest, in the Change of Control Severance Plan at any time during the period from September 28, 1999 through December 8, 2003," subject to certain exceptions (*id.* ¶ 5).

### E. Notice of Class Action and Proposed Settlement

Pursuant to the Court's Preliminary Approval Order, plaintiffs' counsel timely submitted proposed forms of the class notice, the summary publication notice, the Proof of Claim and Release, and the Securities Plan of Allocation. On April 27, 2004, the Court approved those submissions and ordered plaintiffs to distribute and circulate them. At the same time, the Court scheduled a final hearing on the fairness of the proposed partial settlement for July 23, 2004.

Beginning in June 2004, plaintiffs have provided extensive notice to class members and potential claimants. The Class Action Administrator (The Garden City Group, Inc. ("GCG")) mailed approximately 979,000 copies of the Court-approved notice to GX securities holders and nominee holders. (Affidavit of Shandarese Garr (the "Garr Aff.").) GCG mailed some 10,000 additional notices in July 2004 to participants in the relevant GX ERISA plans. (*Id.*) The notice package included the materials previously approved by the Court, including a Proof of Claim (for Securities Class members), the complete text of the Securities Release and the ERISA release, and a postage-paid envelope for Securities Class members to return their claim forms to GCG. The Class Notice provided detailed information about the securities and ERISA actions, the settlement benefits available to the various classes, procedures for submitting claim forms, class members' rights to object to the settlement and appear at the fairness hearing, and Securities Class members' right to opt out of the Securities Class.

Plaintiffs' counsel also arranged to publish the Court-approved Summary Notice in *The New York Times, The Wall Street Journal, USA Today,* and 16 regional newspapers. (Garr Aff.) Like the Notice mailed to class members, the Summary Notice detailed information about the actions, explained the differences among the various classes, specified each class's rights, and provided Inter-

net contact information and a toll-free number to use for assistance, claim forms, and other information. In addition, unions representing GX employees provided further notice to their members.

Plaintiffs' lead counsel published the full Notice (in English and Spanish), and the Summary Notice on their websites, as well as on a special website created for this settlement: www.globalcrossinglitigation.com. (*Id.*) They also posted on the special website certain key documents relating to the Actions, including the Settlement Agreement, the Court's March 19, 2004, Order preliminarily approving the settlement, the various complaints, and the Court's ruling on the underwriters' motion to dismiss.

### F. Submissions Concerning the Proposed Settlement

Counsel for Securities Lead Plaintiffs, ERISA Consolidated Lead Plaintiffs, AGC investor plaintiffs, *Pusloskie* Plaintiffs, and Settling Defendants filed submissions in support of the partial settlement on July 16, 2004. These submissions were accompanied by numerous declarations from fact and expert witnesses.

Objections were filed by certain nonsettling defendants (the Underwriter Defendants, the Citigroup Defendants, and Arthur Andersen LLP and the Individual Andersen Defendants (collectively, the "Andersen Defendants")) and by several settlement-class members (Albert Boone Almanza, Robert L. Barrett, Leon Behar, Joseph P. Geiger, Jr., Ann F. Hildebrand, James O. Lee, Patty Liao, Michael Myers, Tina Nachom, Michael J. Nighan, and Debbie Standiffe). Jonathan Michaels also submitted a letter regarding opt-out notices. The settling parties filed submissions in response to these objections to the partial settlement.

### G. The Fairness Hearing

The Court held a hearing regarding the fairness, reasonableness, and adequacy of the proposed partial settlement on July 23, 2004. Counsel for Securities Lead Plaintiffs, ERISA Consolidated Lead Plaintiffs, AGC investor plaintiffs, *Pusloskie* Plaintiffs, and Settling Defendants made presentations in support of the proposed partial settlement. Counsel for several non-parties—the DOL's Office of the Solicitor and the GX Estate Representative—also spoke in support of the proposed settlement. DOL expressed its belief that approval of the ERISA settlement would serve the public interest. (Fairness Hearing Tr. 14.)

Few objections were made. Counsel for settlement-class member Tina Nachom presented objections to the proposed settlement. Counsel for the Underwriters Defendants and the Andersen Defendants presented objections to the "Complete Bar Order" that was part of the original proposed settlement. The Settling Defendants and Non–Settling Defendants have since resolved this issue, and at the November 4, 2004, hearing the Settling Defendants and Plaintiffs agreed to adopt the Non–Settling Defendants' proposal for an alternate bar order, more limited than the original Complete Bar Order.

### H. The Present Motion

The partial settlement of the securities case, to which this Court gave preliminary approval on March 19, 2004, calls for a payment of approximately $245 million (subject to a fluctuating exchange rate, and deductions for certain fees, payments, reserves, and implementation costs), to resolve plaintiffs' claims against the Settling Defendants and STB. The settlement consists of $195.5 million from the Settling Defendants' insurers, $30 million from the former Global Crossing Chairman Gary Winnick, and $19.5 million from STB. Notably, this *partial* settlement—the case will proceed against the 68 Non–Settling Defendants—is one of the largest settlements since the passage of the Private Securities Litigation Reform Act ("PSLRA"). The ERISA settlement, which finally resolves the ERISA cases, provides for a settlement amount totaling some $78 million.

Now, Lead Plaintiffs and Settling Defendants move for an Order granting final approval of the partial settlement between the Settling Defendants and STB and two putative classes of the GCL and AGC shareholders. Lead Plaintiffs further move the Court (1) to certify a Securities Settlement Class "consisting of all persons, entities, or legal beneficiaries or participants in any entities

who, from February 1, 1999, through December 7, 2003, purchased, sold, exchanged, acquired, disposed of, transferred or made any other investment decision involving [GCL] or [AGC] securities" (Memorandum of Law in Support of Lead Plaintiffs' Motion for Final Approval of Proposed Partial Settlement and Certification of a Settlement Class ("Lead P. Mem.") at 1); (2) to appoint PERS and STRS as class representatives of the Securities Settlement Class; and (3) to appoint Securities Lead Counsel as counsel for the Securities Settlement Class. (*Id.*) The ERISA Plaintiffs and Defendants move for similar relief.

## DISCUSSION

### I. *Class Notice and Certification*

The Court's March 19, 2004, Order preliminarily approved the procedures for notifying class members about the partial settlement. On April 27, 2004, the Court approved the notice materials. Based on the findings set forth below, the Court confirms its prior conclusions.

### A. Notice

#### 1. Adequacy of the Notice

■ Federal Rule of Civil Procedure 23(c) describes the notice to class members when a court certifies a class. In contrast, Rule 23(e) describes the notice to class members when a court is asked to approve a class-action settlement. Where, as here, the parties seek simultaneously to certify a settlement class and to settle a class action, the elements of Rule 23(c) notice (for class certification) are combined with the elements of Rule 23(e) notice (for settlement or dismissal). *See, e.g., Hitt v. Nissan Motor Co.,* 552 F.2d 1088 (5th Cir.1977). As Rule 23(e)'s notice requirements are less specific than that of Rule 23(c)'s, *see, e.g., Zimmer Paper Prods. Inc. v. Berger & Montague, P.C.,* 758 F.2d 86, 90 (3d Cir.1985), the Court will focus on Rule 23(c)'s requirements.

■ Under both the Federal Rules of Civil Procedure and due process norms, the adequacy of notice to class members depends on the particular circumstances of each case. *See* Fed.R.Civ.P. 23(c)(2)(B) (requiring, for opt-out classes certified under Rule 23(b)(3), "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort"); *see Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"). Conformity with the requirements of Rule 23(c)(2) fulfills the due process mandate. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 173, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Thus, for opt-out class actions, due process and the Federal Rules require individual notice only to "all class members whose names and addresses may be ascertained through reasonable effort." *Id.; accord* Fed.R.Civ.P. 23(c)(2)(B); *In re NASDAQ Market–Makers Antitrust Litig.,* 1999 WL 395407, at *2 n. 3 (S.D.N.Y. June 15, 1999) (no requirement to notify each and every class member individually). For non-opt-out cases, such as the ERISA Actions, Rule 23 requires only such unspecified "appropriate notice" as "the court may direct," Fed.R.Civ.P. 23(c)(2)(A); *see, e.g., In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. 493, 515 n. 19 (S.D.N.Y.1996) ("Notice under Rule 23(b)(2) is flexible, and may consist entirely of published notice in appropriate circumstances.").

■ GCG, the Class Action Administrator, administered the mailing of individual notice by first-class mail to all reasonably locatable Securities and ERISA Class Members at their last-known addresses. GCG contacted GX's transfer agent and requested the most recent addresses for all GX shareholders of record. (Eisenhofer Decl. ¶ 86 (Liebesman Decl., Ex. C).) In addition, GCG obtained the names and addresses of participants in the relevant GX employee-benefit plans from those plans' administrators and from GX. (Affidavits of Shandarese Garr, dated July 16, 2004 (the "Garr Aff."), July 21, 2004 (the "First Supp. Garr Aff."), and August 23, 2004 (the "Second Supp. Garr Aff.")) As of July 21, 2004, GCG had mailed a total of 1,123,967 packets of individual notice materials (including 2,559 packets that were re-mailed to updated addresses provided by the U.S. Postal Service). (First Supp. Garr Aff. ¶ 5.)

When nominees provided names and addresses to GCG, GCG mailed individual notice packets to those persons or entities. (Second Supp. Garr Aff. ¶ 4.) When nominees requested payment of expenses to research beneficial owners and/or mail notice to them, GCG advanced the payment of those expenses. Some nominees that did their own mailings sought reimbursement for postage, research costs, and handling costs. (*Id.* ¶ 5.) In addition to supervising the mailing of individual notice to more than one million individuals or entities, GCG arranged for broad publication of the Summary Notice in national and local, English and Spanish, newspapers on June 8, 2004. (Garr Aff. ¶ 7.)

The notice materials were also published on several Internet websites, including a website (*www.globalcrossinglitigation.com*) designed to inform potential class members about the settlement. This dedicated website, which went live on June 8, 2004, contained copies of the notice materials and various legal documents and Court Orders relating to the Actions. (*Id.* ¶ 6.) In addition to the website, GCG established a toll-free phone number that potential class members could call to obtain information or ask questions. The phone system became operational on June 8, 2004, and had received 2,798 calls by July 16, 2004. (*Id.* ¶ 5.)

These procedures collectively satisfied Rule 23(c)(2)(B)'s requirement that individual notice be sent to all potential Securities Class members identifiable through reasonable effort—and went well beyond the requirements for the non-opt-out ERISA classes. *See, e.g., In re Indep., Energy Holdings PLC Sec. Litig.*, 302 F.Supp.2d 180, 185–86 (S.D.N.Y. 2003) (due process satisfied by mailing approximately 30,000 notice packets to all reasonably identifiable persons who purchased securities during class period and by publishing summary notice in *The New York Times*); *see also, e.g., In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 167–69 (2d Cir.1987) (approving letter notice to reasonably identifiable class members, supplemented by "various forms of substitute notice," including publication in various media); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 164 F.R.D. 362, 368 (S.D.N.Y.1996) (approving individual notice to class members "whose address could reasonably be located" and

summary notice published twice in national editions of the *Wall Street Journal, New York Times,* and *U.S.A. Today*), *aff'd mem.,* MDL No. 1005, 107 F.3d 3, 1996 WL 739258 (2d Cir. Dec. 27, 1996).

### 2. Content of the Notice

■ The *content of the notice*—whether mailed directly to class members or communicated by publication or the Internet—also satisfied Rule 23, due-process norms, and the PSLRA. Rule 23(c)(2)(B) specifies certain information that a class notice in a Rule 23(b)(3) action must contain, including (i) the nature of the case, the class definition, and the claims, issues, or defenses in the action, (ii) class members' right to exclude themselves from the class, (iii) the binding effect of a class judgment on all class members who do not request exclusion, and (iv) class members' right to object to the partial settlement and appear through counsel. The PSLRA contains additional requirements applicable to the securities action. 15 U.S.C. §§ 78u–4(a)(7), 77z–1(a)(7). The notice must contain:

(A) Statement of recovery—the amount of the settlement determined in the aggregate and on an average per share basis;

(B) Statement of potential outcome of case—amount of damages per share recoverable if plaintiffs were to prevail on every claim. If the parties are unable to agree on damages, a statement concerning the issues on which the parties disagree;

(C) Statement of attorneys' fees—statement of fees and costs to be applied for in the aggregate and on a per share basis;

(D) Identification of lawyers' representatives—the name, telephone number, and address of counsel available to answer questions; and

(E) Reasons for settlement—a brief statement explaining the reasons why the parties are proposing the settlement.

*In re Indep. Energy Holdings,* 302 F.Supp.2d at 184. The notice also must include a cover page summarizing the required information. 15 U.S.C. §§ 78u–4(a)(7), 77z–1(a)(7)(A). The notice in this case satisfied all the foregoing requirements.

Rule 23(c)(2)(A), which governs Rule 23(b)(1) and (b)(2) cases such as the ERISA

Actions, does not prescribe the contents of notice. Accordingly, the Court will focus on Rule 23(c)(2)(B)'s more comprehensive notice requirements. The individual notice here complied with Rule 23(c)(2)(B). The notice clearly informed class members of the relevant aspects of the class action and the partial settlement, including:

- The nature of the case, a statement of the parties' respective claims and defenses, the background of the settlement, and how the settlement funds will be allocated if the settlement is approved;
- Class members' right to exclude themselves from the securities settlement class (but not the ERISA classes), to object to any aspect of the settlement, and to appear at the fairness hearing—and the processes and deadlines for doing so; and
- The binding effect of any judgment on all persons who do not exclude themselves from a class, and the impact on class members if the settlement is approved.

Consistent with the PSLRA's requirements, the notice also:

- set out the amount of the settlement and the aggregate recovery per share, and provided the Securities Plan of Allocation as Exhibit A;
- stated that the parties disagree on the amount of damages to which class members would be entitled, and summarized the bases for that disagreement;
- stated the amount of attorneys' fees and costs sought;
- provided the name, address, and telephone number of lead counsel for the various classes; and
- explained why the parties have proposed a settlement, including the risk that depletion and potential unavailability of insurance funds could defeat plaintiffs' ability to collect any judgment.

In addition, the notice provided a toll-free telephone number to call for more informa-tion. The Summary Notice—published online in English and Spanish and in 19 newspapers—also contained information required by Rule 23, the PSLRA, and due process, and provided a toll-free number for class members to call for the full individual notice. The website also contained the notice and the toll-free number.

These notices provided sufficient information for class members to understand the proposed partial settlement and their options. See, e.g., In re PaineWebber Ltd. P'ships Litig., 171 F.R.D. 104, 124 (S.D.N.Y. 1997) (settlement notice adequate where "level of detail apprises the class members of the salient terms of the settlement and affords them a reasonable opportunity to present any objections."); In re Independent Energy Holdings PLC Sec. Litig., 302 F.Supp.2d at 184 (approving notice where information required by PSLRA was found partly in individual notice and partly in summary notice).

### B. Certification

On March 19, 2004, this Court preliminarily certified the ERISA classes under Fed. R.Civ.P. 23(b)(1) and (b)(2), and the Securities Class under Fed.R.Civ.P. 23(b)(3), as described above, solely for purposes of this partial settlement. (Preliminary Approval Order at 8–17.) Members of the ERISA Consolidated Class and the ERISA Pusloskie Class are members of those classes only to the extent they participated in their respective employee-benefit plans, but not as to any purchases, sales, exchanges, acquisitions, disposals, transfers, or any other investment decisions involving Global Crossing Securities outside of and separate from their participation or interest in their respective benefit plans. The Court now grants final certification of the Securities Class, the ERISA Consolidated Class, the ERISA Pusloskie Class, and the ERISA Simonetti Class for settlement purposes and finalize the appointment of Securities Lead Plaintiffs, Securities Plaintiffs,[7] and ERISA Lead Plaintiffs as Class Representatives.

7. The Securities Plaintiffs are Staro Asset Management, Bennett Restructuring Funds, Richard P. Kleinknecht, James F. Tucker, Bella Pill, B.I. Shuster, Michael A. Bernstein Profit Sharing Plan, and Roman Foltyn.

■ The Second Circuit has acknowledged the propriety of certifying a class solely for settlement purposes, *e.g., Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982), and the Supreme Court has confirmed the viability of such certifications, *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 619–22, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *see also, e.g., Thompson v. Metropolitan Life Ins. Co.,* 216 F.R.D. 55, 60–61 (S.D.N.Y.2003) (certifying class for settlement purposes); *Duncan v. Unity Life & Accident Ins. Ass'n,* No. 00 Civ. 7261, 2003 WL 1907959, at *3 (S.D.N.Y. Apr. 18, 2003) (same). Moreover, the Second Circuit has instructed district courts to interpret Rule 23's requirements liberally. *See, e.g., Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 179 (2d Cir.1990). Nonetheless, this Court "may certify this as a class action only after undertaking 'rigorous analysis' to assure that the requirements of the Rule are satisfied." *In re NASDAQ Litig.,* 169 F.R.D. at 504 (internal citation omitted). Whether certified for settlement or litigation purposes, a class must meet each of the four requirements in Rule 23(a) and at least one of the three requirements in Rule 23(b). *See* Fed.R.Civ.P. 23. At the same time, however, a district court "[c]onfronted with a request for settlement-only class certification, ... need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Amchem,* 521 U.S. at 620, 117 S.Ct. 2231 (internal citation omitted).

Class certification is appropriate here for settlement purposes because the Actions meet the requirements of both Rule 23(a) and Rule 23(b).[8]

### 1. Securities and ERISA Settlement Classes: Rule 23(a)

Certification is appropriate under Rule 23(a) if (1) the class is so numerous that joinder of all members would be impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the class's interests. Fed.R.Civ.P. 23(a).

#### a. Numerosity

Certification under Rule 23(a)(1) is appropriate where a class has so many members that joinder of all members would be "impracticable." *Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir.1993). Impracticable does not mean impossible, but simply difficult or inconvenient. *Id.; see also In re NASDAQ Litig.,* 169 F.R.D. at 508–09. Here, where more than one million Claim Packets were mailed to potential Class Members (Garr Aff. ¶ 11 (Liebesman Decl., Ex. E)), Rule 23(a)(1)'s numerosity requirement is satisfied. *See, e.g., In re NASDAQ Litig.,* 169 F.R.D. at 508–09 (joinder impracticable where class members numbered at least a million); *see also, e.g., In re Sumitomo Copper Litig.,* 189 F.R.D. 274, 278 (S.D.N.Y. 1999) (numerosity requirement met where potential class exceeded 20,000 members).

#### b. Commonality

Rule 23(a)(2)'s requirement of common factual or legal questions is not demanding and "does not require an identity of claims or facts among class members; instead, [t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Johnston v. HBO Film Mgmt., Inc.,* 265 F.3d 178, 184 (3d Cir.2001) (quotation marks omitted, alteration in original); *accord, e.g., Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 625 (5th Cir. 1999); *In re American Med. Sys., Inc.,* 75 F.3d 1069, 1080 (6th Cir.1996). The securities and ERISA actions involve at numerous questions of law or fact common to the members of the various classes.

#### (1) Securities Settlement Class

■ Securities-fraud cases generally meet Rule 23(a)(2)'s commonality requirement. *See In re Oxford Health Plans, Inc.,* 191 F.R.D. 369, 374 (S.D.N.Y.2000) ("Where the facts as alleged show that Defendants' course of conduct concealed material information

---

**8.** Settling Defendants and STB agreed not to oppose class certification for settlement purposes, but they would not be precluded from arguing that certification of one or more litigation classes would be inappropriate if the proposed partial settlement were not to become final.

from the entire putative class, the commonality requirement is met"). Securities-fraud cases are "essentially course of conduct cases because the nub of plaintiffs' claims is that material information was withheld from the entire putative class in each action, either by written or oral communication." *Id.* at 374 (quotation marks omitted).

Securities Lead Plaintiffs have alleged that GX's officers, directors, and others participated in misrepresenting GX's assets, obligations, and cash revenues, particularly in accounting for transactions involving indefeasible rights of use ("IRUs"). These claims present common questions of law and fact, including:

- Whether the Settling Defendants' and/or STB's actions violated the federal securities laws;
- Whether the Settling Defendants and/or STB participated in and pursued the illegal course of conduct described in the pleadings;
- Whether the Settling Defendants and/or STB omitted and/or misrepresented material facts;
- Whether statements attributable to the Settling Defendants and/or STB omitted material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading;
- Whether the Settling Defendants and/or STB knew or recklessly disregarded that their statements were false and misleading;
- Whether the Settling Defendants' and/or STB's conduct artificially inflated the prices of GCL and AGC securities during the relevant time period; and
- The extent (if any) to which the Securities Class Members sustained damages, and the proper measure of any such damages.

### (2) ERISA Settlement Classes

■ The ERISA Class Members have alleged that the ERISA defendants breached their fiduciary duty in connection with the administration of GX's employee-benefit plans. These allegations certainly involve common questions of fact or law.

Under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), any plan participant or beneficiary may sue for breach of fiduciary duties "in a representative capacity on behalf of the plan as a whole." *Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 142 n. 9, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). "In general, the question of defendants' liability for ERISA violations is common to all class members because a breach of a fiduciary duty affects all participants and beneficiaries." *Banyai v. Mazur,* 205 F.R.D. 160, 163 (S.D.N.Y. 2002). Thus, the ERISA plaintiffs' claims involve common questions about matters such as defendants' fiduciary status, whether defendants breached any fiduciary duty, and the measure of the plans' alleged losses.

### c. Typicality

The various class representatives' claims satisfy Rule 23(a)(3)'s requirement that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). Typicality ensures that class representatives "have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." *In re Oxford Health Plans,* 191 F.R.D. at 375 (quotation marks omitted).

■ Typicality exists where the "claims of the representative plaintiffs arise from the same course of conduct that gives rise to claims of the other class members, where the claims are based on the same legal theory, and where the class members have allegedly been injured by the same course of conduct as that which allegedly injured the proposed representatives." *Id.* Indeed, when "the same [alleged] unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux,* 987 F.2d at 936–37. Here, the class representatives' and the class members' claims arise from the same alleged course of conduct and are based on the same legal theories.

### d. Adequacy of Representation

■■■ Rule 23(a)(4) is satisfied if "the representative parties will fairly and adequately protect the interests of the class." Fed. R.Civ.P. 23(a)(4). The Court must evaluate adequacy of representation by considering (i) whether the class representatives' claims conflict with those of the class and (ii) whether class counsel is qualified, experienced, and generally able to conduct the litigation. *In re Oxford Health Plans, Inc.*, 191 F.R.D. at 376; *In re the Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.1992). Both standards are met here.

■■■ There is no conflict between the class representatives and the other class members. All share the common goal of maximizing recovery. *See, e.g., In re Drexel*, 960 F.2d at 291. Moreover, the securities and ERISA class representatives retained counsel with extensive experience in complex securities and ERISA litigation and class-action proceedings in this Court and in other federal courts throughout the United States. Class counsel's advocacy has resulted in a partial settlement of this case that already is among the largest ever achieved in class-action litigation. Class counsel consistently demonstrated that they are qualified and able to conduct the litigation.

### 2. ERISA Settlement Classes: Rule 23(b)

■■■ The Court confirms its preliminary conclusion that the ERISA classes are certifiable under Fed.R.Civ.P. 23(b)(1) and 23(b)(2) for settlement purposes.

### a. Rule 23(b)(1)

A class may be certified under Rule 23(b)(1) if:

> the prosecution of separate actions by or against individual members of the class would create a risk of
> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

Fed.R.Civ.P. 23(b)(1). Rule 23(b)(1)(A) "considers possible prejudice to the defendants, while 23(b)(1)(B) looks to possible prejudice to the putative class members." *In re IKON Office Solutions, Inc. Sec. Litig.*, 191 F.R.D. 457, 466 (E.D.Pa.2000).

Because of ERISA's distinctive "representative capacity" and remedial provisions, "ERISA litigation of this nature presents a paradigmatic example of a(b)(1) class." *Kolar v. Rite Aid Corp.*, No. Civ.A. 01–1229, 2003 WL 1257272, at *3 (E.D.Pa. March 11, 2003); *see Rankin v. Rots*, 220 F.R.D. 511, 521–23 (E.D.Mich.2004); *see also In re IKON Office Solutions*, 191 F.R.D. at 466.

### b. Rule 23(b)(2)

A class may be certified under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). ERISA Class Members' claims are based on alleged conduct that purportedly applies generally to the ERISA Classes. ERISA plaintiffs contend that defendants breached their fiduciary duties to employee-benefit-plan participants by, among other things, failing reasonably to evaluate whether GX stock was a prudent investment for the plans, failing to monitor the plans' fiduciaries, failing to disclose material information about GX stock as a retirement investment, and/or failing properly to administer the Change of Control Severance Plan. Where monetary relief would flow automatically to the class as a whole from a grant of equitable relief for breach of fiduciary duty, certification under Rule 23(b)(2) is appropriate. *See, e.g., Berger v. Xerox Corp. Retirement Income Guar. Plan*, 338 F.3d 755, 763–64 (7th Cir.2003); *see also Flanagan v. Allstate Ins. Co.*, 223 F.R.D. 489, 497–98 (N.D.Ill.2004). The ERISA Classes therefore satisfy all the requirements of Rules 23(a), (b)(1), and (b)(2) for settlement purposes.

### 3. Securities Settlement Class: Rule 23(b)

A class can be certified under Rule 23(b)(3) if "the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Rule 23(b)(3) is "designed to secure judgments binding all class members save those who affirmatively elect[ ] to be excluded," where a class action will "achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 614–15, 117 S.Ct. 2231 (quotation marks omitted, ellipses in original). Certification of the Securities Class under Rule 23(b)(3) for settlement purposes will serve these goals.

### a. Predominance of Common Questions

 The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623, 117 S.Ct. 2231. "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *In re Livent, Inc. Noteholders Sec. Litig.*, 210 F.R.D. 512, 517 (S.D.N.Y.2002) (internal quotation marks omitted). This test generally is "readily met in certain cases alleging consumer or securities fraud." *Amchem*, 521 U.S. at 625, 117 S.Ct. 2231. Securities Lead Plaintiffs allege that the Settling Defendants and STB engaged in a course of conduct that caused the entire Securities Class's losses. These allegations satisfy Rule 23(b)(3)'s predominance requirement for settlement purposes.

### b. Superiority to Other Methods of Adjudication

 Rule 23(b)(3)'s "superiority" requirement asks the Court to consider:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). Where, as here, a class is being certified solely for *settlement* purposes, the Court need not consider the manageability issues that would arise if the case were to be *litigated* as a class action. *Amchem*, 521 U.S. at 620, 117 S.Ct. 2231. In light of the legal and factual issues common to Securities Class members, individual prosecutions of securities claims would make little practical sense, especially in light of the proposed settlement. Those persons or entities wishing to pursue their own actions presumably have excluded themselves from the settlement class; the remainder presumably have accepted the efficiencies of classwide litigation. *See, e.g., id.* at 617, 117 S.Ct. 2231 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights") (internal quotation marks omitted); *In re Livent Sec. Litig.*, 210 F.R.D. at 518; *In re Blech Sec. Litig.*, 187 F.R.D. 97, 107–08 (S.D.N.Y. 1999).

In addition, this Court currently is the most desirable forum in which to concentrate GX-related claims. The MDL Panel centralized all GX-related cases in this Court; GX's headquarters are in nearby New Jersey, and the Southern District of New York is centrally located and convenient for the parties and counsel.[9] The Court therefore finds that the

---

9. The convenience of witnesses is not an issue if these cases are being settled, but this District is a convenient hub for witnesses in any event.

Securities Class meets Rule 23(b)(3)'s requirements for settlement purposes.

II. *Judicial Approval of Class Action Settlements*

■ The settlement of a class action requires court approval. Fed.R.Civ.P. 23(e). "[T]he district court must determine that a class action settlement is fair, adequate, and reasonable, and not a product of collusion." *Joel A. v. Giuliani*, 218 F.3d 132, 138 –139 (2d Cir.2000). Thus, the determination that a settlement is worthy of approval is within the discretion of the district court. *In re Masters Mates & Pilots Pension Plan & IRAP Litig.*, 957 F.2d 1020, 1026 (2d Cir. 1992); *In re NASDAQ Market–Makers Antitrust Litig.*, 187 F.R.D. 465, 473 (S.D.N.Y. 1998).

■ As a general policy matter, federal courts favor settlement, especially in complex and large-scale disputes, so as to encourage compromise and conserve judicial and private resources. *Bano v. Union Carbide Corp.*, 273 F.3d 120, 129–30 (2d Cir.2001) (collecting cases); *Weinberger*, 698 F.2d at 73; *Chatelain v. Prudential–Bache Sec., Inc.*, 805 F.Supp. 209, 212 (S.D.N.Y.1992). Accordingly, this Court will take into consideration such public policy concerns in exercising its discretion. *See Thompson*, 216 F.R.D. at 61; *In re NASDAQ Litig.*, 187 F.R.D. at 473.

■ While acknowledging the policy considerations that favor settlement, the Court "must eschew any rubber stamp approval in favor of an independent evaluation" of the settlement. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir.1974). The Court "has a 'fiduciary' duty to the nonrepresentative class members who were not party to the settlement agreement because '[i]nherent in any class action is the potential for conflicting interests among the class representatives, class counsel, and absent class members.'" *Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 262 (S.D.N.Y.1998) (internal citations omitted, alteration in original). Unlike "typical adversary litigation," where the Court sits "as an umpire," in this situation the Court "sits also as a guardian for class members who have not received a notice or who lack the intellectual or financial resources to press objections." *Weinberger*,

698 F.2d at 69 n. 10. Although the Court must make its own independent evaluation of the settlement, the Court must also assess the settlement as it stands, without modifying its terms, *In re Warner Communications Sec. Litig.*, 798 F.2d 35, 37 (2d Cir.1986) (citation omitted), and without substituting its "business judgment for that of counsel, absent evidence of fraud or overreaching." *In re McDonnell Douglas Equipment Leasing Sec. Litig.*, 838 F.Supp. 729, 737–38 (S.D.N.Y.1993) (internal quotation marks omitted); *see Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F.Supp.2d 254, 257 (S.D.N.Y.2003).

With these policy concerns in mind, the Court must determine "whether the compromise is fair, reasonable and adequate." *Weinberger*, 698 F.2d at 73; *see Gerber v. MTC Electronic Tech. Co.*, 329 F.3d 297, 302 (2d Cir.2003). This determination rests on the consideration of two types of evidence: the settlement's substantive terms, and the negotiating process leading up to the settlement. *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir.2001); *In re Austrian & German Bank Holocaust Litig.*, 80 F.Supp.2d 164, 173 (S.D.N.Y.2000). The Court will discuss each in turn.

A. Substantive Terms of the Proposed Settlement

■ The Court's "primary concern is with the substantive terms of the settlement," *Weinberger*, 698 F.2d at 73–74, and how they "compare[ ] to the likely result of a trial," *In re NASDAQ Litig.*, 187 F.R.D. at 473 (internal quotation marks omitted). To this end, the Second Circuit has identified nine so-called *"Grinnell* factors" as relevant:

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reason-

ableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation[.]

*Grinnell,* 495 F.2d at 463 (internal citations omitted); *D'Amato,* 236 F.3d at 86. In finding that a settlement is fair, not every factor must weigh in favor of settlement, "rather the court should consider the totality of these factors in light of the particular circumstances." *Thompson v. Metropolitan Life Ins. Co.,* 216 F.R.D. 55, 61 (S.D.N.Y.2003).

■■■ After weighing these factors, this Court concludes that the proposed partial settlement is fair, adequate, and reasonable.

### 1. Complexity, Expense, and Likely Duration of Litigation

The complexity of this securities class action—with a class period of four years and numerous Securities Act, Exchange Act, and state law claims brought against 81 defendants who played disparate roles in the alleged fraud at GCL and AGC—is manifest. The ERISA cases are only slightly less expansive. A litigated resolution of the actions could take years and would impose great expense on all parties as well as huge burdens on the Court. *See In re NASDAQ Litig.,* 187 F.R.D. at 477 (class actions "have a well-deserved reputation as being most complex") (quotation marks omitted).

Litigating the actions through trial would be enormously complicated, time-consuming, and expensive, requiring complex, fact-intensive analyses of such issues as the various types of accounting treatment for sales of IRUs; the facts and business purposes behind each of GCL's and AGC's reciprocal transactions with other telecommunications companies, and the accounting for those transactions; the accuracy and materiality of many different financial statements issued by GCL and AGC over several years; the conduct and state of mind of each of the many individual defendants allegedly responsible for making materially false or misleading statements; the technological aspects of the telecommunications industry, the rapidly changing environment in the telecommunications sector during the class period, and the collapse of the technology sector (which, in turn, affected the telecommunications sector); the point at which (if ever) the continued purchase and/or holding of GX stock in the ERISA plans allegedly became imprudent, and the point at which (if ever) and the basis upon which an independent fiduciary allegedly would have decided to take actions contrary to the terms of the ERISA plans (and what such a fiduciary purportedly would have done); and other such matters.

The Settling Defendants could be expected to litigate the cases vigorously, forcing plaintiffs to overcome motions to dismiss and/or for summary judgment and to demonstrate that the putative classes could be certified for litigation purposes. If plaintiffs' claims survived for trial, plaintiffs would have to spend much time and money mastering the immense documentary records and developing fact and expert testimony on complicated technology, accounting, economic, securities, ERISA, and damages issues. And even if plaintiffs prevailed at trial, defendants likely would file post-trial motions and appeals on a variety of difficult issues.

Such tactics would significantly delay any recovery Plaintiffs might eventually obtain. Moreover, plaintiffs' counsel's time and expenses would steadily increase, potentially diminishing the class members' ultimate recovery. Already the litigation has been expensive—attorneys' fees for the Settling Defendants alone exceed $40 million. (Lead P. Mem. at 25.) In addition, protracted litigation could deprive the class members of the substantial amount of insurance money the partial settlement would provide.

The ERISA cases would pose additional factual and legal issues. Fiduciary status, the scope of fiduciary responsibility, the appropriate fiduciary response to the Plans' concentration in company stock and GX's business practices would be issues for proof, and numerous legal issues concerning fiduciary liability in connection with company stock in 401(k) plans remain unresolved. These uncertainties would substantially increase the ERISA cases' complexity, duration, and expense—and thus militate in favor of settlement approval.

In contrast, the proposed partial settlement would grant relief to all class members without subjecting them to the risks, complexity, duration, and expense of continuing

litigation. Therefore, taken in context, the proposed partial settlement would maximize the recovery of insurance money for the class. *See, e.g., Maley v. Del Global Tech. Corp.*, 186 F.Supp.2d 358, 362 (S.D.N.Y.2002) ("Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk and delay of trial. These factors weigh in favor of the proposed [s]ettlement"); *Klein v. PDG Remediation, Inc.*, No. 95 Civ. 4954, 1999 WL 38179, at *2 (S.D.N.Y. Jan. 28, 1999) (complexity, expense, and likely duration of litigation favored settlement that "offer[ed] Class members the benefit of immediate recovery as opposed to an uncertain award several years from now").

### 2. Class Members' Reaction to the Settlement

Despite the huge potential size of the classes here, only six securities-class members filed timely objections to the proposed partial settlement and, thus far, six additional class members have submitted untimely objections.[10] Only nine securities-class members timely requested exclusion from the Securities Class. With respect to ERISA Class Members, (i) no ERISA Class Member has objected to any aspect of the ERISA settlements except for the requested attorneys' fees (discussed below), and (ii) the DOL has advocated approval of the proposed ERISA settlement, which depends on approval of the proposed securities settlement.

These extremely low numbers of objectors and opt-outs strongly support settlement approval. *See D'Amato*, 236 F.3d at 86–87; *In re Holocaust Litig.*, 80 F.Supp.2d at 175. Indeed, courts routinely approve settlements involving far more dissent than has arisen here. *See Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 24 (2d Cir.1987); *see also, e.g., Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118–19 (3d Cir.1990) (directing approval of settlement where "only" 10% of class objected); *Boyd v. Bechtel Corp.*, 485 F.Supp. 610, 624 (N.D.Cal.1979) (objections from only 16% of class held "persuasive" of settlement's

adequacy). Here, the number of objections as a percentage of the total class size is vanishingly small.

The securities-class objectors' submissions raise nine issues: (i) the settlement amount is too low; (ii) the settlement does not account for certain alleged but unexplained financial dealings between GX-related entities and entities purportedly controlled by Jean Ronald Getty; (iii) Winnick and other individual defendants did not contribute enough toward settlement; (iv) the proposed Securities Class is too broad; (v) the class notice was inadequate; (vi) the scope of the Release is too broad; (vii) settlement is an inherently unfair way to resolve this dispute; (viii) the Securities Allocation Plan improperly fails to compensate class members whose claims are valued at less than $10, and (ix) the requested attorneys' fees are excessive.

None of these objections is substantial. The first three go essentially to the size of the settlement. As discussed in great detail below, the settlement provides a large recovery, which is the best that could be obtained under the circumstances. The risks of litigation, and the substantial likelihood that further litigation would erode or even eliminate the insurance proceeds, indicate that plaintiffs face serious substantive constraints that limit the size of the potential settlement. The objection that the individual defendants should have contributed more to the settlement is largely symbolic: While the objectors argue that the Settling Defendants are highly culpable and ought to contribute substantially from their own resources, most of these defendants, whatever their culpability, lack the financial ability to contribute to the fund in amounts that would materially improve the settlement. The one exception, Winnick, is already contributing an amount represented to be the largest individual contribution to a class action settlement in history. Perhaps he would have to pay more if a judgment could be obtained against him. But this is a negotiation, and Winnick has not

---

**10.** Timely objections were submitted by Albert Boone Almanza, Leon Behar, James O. Lee, Tina Nachom, Michael J. Nighan and Debbie Standiffe. Untimely objections were submitted by Robert L. Barrett, Joseph P. Geiger, Jr., Ann F. Hildebrand, Patty Liao, Michael Myers, and Diane Roberts. Without deciding whether the late objectors have demonstrated excusable neglect for their tardiness, the Court will consider their objections in determining whether to approve the proposed settlement.

been found liable for fraud and may never be found liable. And even if he were, it is unclear that plaintiffs would be better off. The insurance proceeds cannot be yielded to the settlement without Winnick, and the insurance proceeds are critical to achieving meaningful compensation for Plaintiffs.[11]

The next four objections concern procedural matters already discussed above. The class definition and notice are, for the reasons stated above, appropriate and sufficient, and as discussed, settlement is in fact a preferred as well as permissible method for resolving cases of this sort. The scope of the released claims in the settlement agreement is not impermissibly broad—to the extent the settlement agreement releases claims not covered by the amended complaint, a class-action settlement can release a claim based on factual predicates similar to those underlying the class's claims "even though the claim was not presented and might not have been presentable in the class action." *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir.1982).

Finally, the treatment of small claims and the attorneys' fees are fully discussed and approved below. *See infra* Part V. At any rate, this brief discussion of the substance of the objections demonstrates both their lack of substantive merit, and their remarkably small number. The virtual absence of objections and opt-outs, in light of the large size of the plaintiff classes, and the scope and complexity of the settlement, constitutes a ring-

ing endorsement of the settlement by class members.[12]

### 3. Stage of Proceedings and Amount of Discovery Completed

The third *Grinnell* factor—"the stage of the proceedings and the amount of discovery completed"—is intended to assure the Court "that counsel for plaintiffs have weighed their position based on a full consideration of the possibilities facing them." *Klein*, 1999 WL 38179, at *2–3 (quotation marks omitted). Formal discovery is not a prerequisite; the question is whether the parties had adequate information about their claims. *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir.1981); *see D'Amato*, 236 F.3d at 87.

Plaintiffs' attorneys here had the requisite information to make informed decisions about the relative benefits of litigating or settling. Plaintiffs' counsel extensively investigated the relevant facts even before they filed their Complaints. Counsel reviewed numerous documents (many of which had become available through related congressional investigations) and interviewed over 100 former GX employees. When the first tentative settlement discussions began, GX provided plaintiffs' counsel with more than 270,000 pages of documents and 80,000 e-mails. And after signing the Settlement Agreement, which was conditioned on additional discovery, plaintiffs' counsel obtained many more documents from GX. In sum,

11. Shareholder Ann F. Hildebrand and T.L. Vander Pool, the Executor of the Sharlane Getty Vander Pool Estate, jointly submitted a letter complaining that the proposed settlement does not take into account a 1997 $800 million guarantee that the Trust of Mrs. Sharlane Getty Vander Pool allegedly provided to Frontier Corporation or to GX (the letter is unclear). The letter suggests that Jean Ronald Getty used his control of this trust to enrich himself unjustly at the alleged expense of the public and possibly of the Trust itself. Getty is not a defendant in any of the Actions or a Releasee in the proposed settlement, and the alleged transaction occurred before the time period covered by any of the Complaints in the Actions. In evaluating the proposed settlement's fairness, the Court need not consider claims against non-Releasees or claims that do not appear to be covered by the settlement. If Hildebrand, Vander Pool, or any other aggrieved party wishes to pursue a claim against Getty or others based on whatever

allegedly happened in 1997, the settlement does not appear to bar any such claim (at least to the extent the Court can divine the nature of any such claim based solely on Hildebrand's cryptic letter).

12. Indeed, the most substantial objection to the proposed settlement advanced at the Fairness Hearing, and the only one that gave the Court any pause, was advanced not by class members, but by the Non–Settling Defendants, who objected that the scope of the Bar Order proposed in the original settlement went beyond that authorized by the Second Circuit in *Gerber v. MTC*, 329 F.3d 297 (2d Cir.2003). The legality of that proposal was the subject of substantial briefing, followed by additional negotiations. In the end, without conceding the correctness of the objection, the Settling Defendants agreed to the modification proposed by the Non–Settling Defendants, and the objection was withdrawn.

Plaintiffs' counsel appear to have scrutinized the facts of the Actions from the earliest stages of the litigation and developed an informed basis from which to negotiate a reasonable compromise. *See Maley,* 186 F.Supp.2d at 363–64.

#### 4. Plaintiffs' Chances of Establishing Liability

The fourth *Grinnell* factor is the risks that plaintiffs would face in establishing liability if they had to try the Actions on the merits. *Grinnell,* 495 F.2d at 463. This factor does not require the Court to adjudicate the disputed issues or decide unsettled questions; rather, the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement. *In re Holocaust Litig.,* 80 F.Supp.2d at 177. Courts approve settlements where plaintiffs would have faced significant legal and factual obstacles to proving their case. *See, e.g., id.* Such risks abound here. The Settling Defendants and STB have substantial legal and factual defenses that they contend would ultimately prevail in the pretrial stage or at trial. If the actions were to proceed, the Settling Defendants and STB also would present expert testimony on a number of complex disputed legal and factual matters, thereby increasing plaintiffs' litigation risks. *See Thompson,* 216 F.R.D. at 63.[13]

In sum, plaintiffs would confront significant difficulties in litigating their claims and might not recover anything at trial. When viewed against the substantial and certain benefits that a settlement would provide, these considerations support approval of the proposed partial settlement. *See, e.g., In re Holocaust Litig.,* 80 F.Supp.2d at 177.

#### 5. Plaintiffs' Chances of Establishing Damages

##### a. Securities Plaintiffs

Even if plaintiffs could prove the Settling Defendants' and STB's liability, they still would face the task of establishing that each class member's damages (if any) resulted from defendants' alleged misconduct, and the amount of any such damages. *See, e.g., Maley,* 186 F.Supp.2d at 365. Moreover, with respect to the securities claims, the Settling Defendants and STB have contended that, even if the plaintiffs could prove their allegations of wrongdoing, they still could not establish that the alleged misconduct actually caused the plaintiffs' losses. Specifically, the Settling Defendants and STB argue that any such losses resulted from the collapse of the telecommunications sector and the economy as a whole, rather than from GX's alleged misrepresentations, omissions, or misconduct. *See Emergent Capital Inv. Mgt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 197 (2d Cir.2003). Loss causation is a complicated concept, both factually and legally—and has generated a large amount of litigation in recent years. In fact, the Supreme Court granted a writ of certiorari in June 2004 to resolve conflicts among the Circuits relating to loss-causation issues. *Dura Pharm., Inc. v. Broudo,* —— U.S. ——, 124 S.Ct. 2904, 159 L.Ed.2d 811 (2004).

Moreover, even if the plaintiffs could establish some amount of loss causation, they still would need to prove how much of their loss resulted from GX's alleged misconduct, rather than from industry-wide or other macroeconomic factors. Calculation of damages is a "complicated and uncertain process, typically involving conflicting expert opinion" about the difference between the purchase price and the stock's "true" value absent the alleged fraud. *Maley,* 186 F.Supp.2d at 365; *see In re Independent Energy Holdings PLC Sec. Litig.,* No. 00 Civ. 6689, 2003 WL 22244676, at *3 (S.D.N.Y. Sept. 29, 2003) ("[P]roof of damages in securities cases is always difficult and invariably requires expert testimony which may, or may not be, accepted by a jury."). Under these circumstances, the risks faced by the securities plaintiffs in establishing damages are substantial, and this factor favors approving the settlement.

---

13. Indeed, Securities Lead Plaintiffs acknowledged in their memorandum in support of settlement that, although they believe their case has merit, they recognize several "significant risks in establishing liability." (Lead P. Mem. at 30.)

The ERISA plaintiffs' settlement memorandum similarly observed that litigating the ERISA claims would involve "risk, legal and factual," in "a rapidly developing, and somewhat esoteric, area of law." (ERISA P. Mem. at 19–20.)

### b. ERISA Plaintiffs

Like the Securities Plaintiffs, the ERISA Plaintiffs acknowledge that the calculation of damages would be complex, time-consuming, and expensive. Moreover, aside from the difficulties involved in calculating the ERISA damages, the parties disagree on the law bearing on ERISA damages, including whether the loss causation issues discussed above apply to the ERISA 401(k) Actions. These legal disagreements would no doubt lead to motions that would themselves introduce additional time, expenses, and uncertainty. In short, the legal and factual complexities and uncertainties of the ERISA damages case also militate in favor of settlement.

### 6. Risks of Maintaining Class Action Through Trial

No class has been certified in the Actions except in the settlement context. Were these cases not to settle, defendants might contest class certification on various grounds, thereby creating appreciable risk to the class members' potential for recovery. *See, e.g., In re Blech Sec. Litig.,* No. 94 Civ. 7696, 2002 WL 31720381, at *1 (S.D.N.Y. Dec. 4, 2002). And even if plaintiffs could obtain class certification, there could be a risk of decertification at a later stage. *See In re NASDAQ Litig.,* 187 F.R.D. at 476–77 (decertification can occur if management problems arise during litigation; decertification or reversal of certification would deprive class of any recovery).

### 7. Settling Defendants' Ability to Withstand Greater Judgment

The seventh *Grinnell* factor—defendants' ability to withstand a greater judgment—also favors approval of the proposed partial settlement. The Settling Defendants all are individuals, whose assets individually and collectively do not come close to the tens of billions of dollars of liability alleged in the Actions. Nor could those individuals (or the plaintiffs) look to GCL or AGC for indemnification or other financial assistance, because both companies filed for bankruptcy protection. The main settlement funds available to the individuals are the insurance proceeds, which—as discussed above—would be largely consumed by defense costs if this litigation were to continue. And the bulk of those funds—the Pender policy money—could be lost entirely, if the parties are not able to secure the money through the proposed settlement. Thus, without the proposed settlement, class members might well receive far less than the settlement would provide to them, even if they could prevail on their claims. *See, e.g., Teachers' Retirement Sys. of La. v. A.C.L.N., Ltd.,* No. 01 Civ. 11814, 2004 WL 1087261, at *4 (S.D.N.Y. May 14, 2004) (likely depletion of D & O insurance supports settlement approval); *Maley,* 186 F.Supp.2d at 365 (approving settlement where insurance "would be significantly depleted by defense costs").

Moreover, "the fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate." *In re PaineWebber Litig.,* 171 F.R.D. at 129; *see also In re NASDAQ Litig.,* 187 F.R.D. at 477–78. This is especially true where, as here, the other *Grinnell* factors weigh heavily in favor of settlement approval. *See D'Amato,* 236 F.3d at 86 (no abuse of discretion to approve settlement where, despite defendants' ability to withstand higher judgment, settlement was fair in light of other *Grinnell* factors).

### 8. Range of Reasonableness in Relation to Potential Recovery

The final two *Grinnell* factors—the reasonableness of the settlement in light of the best possible recovery and the risks of litigation—also weigh in favor of settlement approval. As noted above, the parties disagree on the amount of potential recovery even if plaintiffs were to prevail on liability. The cash relief in the proposed settlement (before certain settlement-related expenses)—$205 million for the Securities Settlement Class Members and $69 million for the ERISA Class Members—is substantial and falls well within the requisite "range of reasonableness." *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.1972)

█ Unquestionably, the settlement is not rich in comparison to the vast damages Plaintiffs claim to have suffered. However, there is "a range of reasonableness with respect to a settlement," *id.,* and the settle-

ment amount's ratio to the maximum potential recovery need not be the sole, or even the dominant, consideration when assessing the settlement's fairness. "[T]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Grinnell*, 495 F.2d at 455; *see, e.g., In re PaineWebber Litig.*, 171 F.R.D. at 130 (fairness determination turns not on a "mathematical equation yielding a particularized sum ... but rather ... [on] the strengths and weaknesses of the plaintiff's case") (quotation marks omitted).

Due to the complexities inherent in this case, the certainty of this settlement amount has to be judged in this context of the legal and practical obstacles to obtaining a large recovery. Here, as discussed above, these are substantial legal obstacles to Plaintiffs' eventually prevailing in the case. More importantly, even if Plaintiffs obtained, after long and costly litigation, a dramatically larger judgment, there is a significant issue as to whether such a judgment could be collected. With very limited exceptions (primarily defendant Winnick), the individual Settling Defendants do not have sufficient resources to make a contribution, either to the settlement or to satisfying any judgment, that is meaningful in relation to the size of the claimed damages. The money to satisfy a judgment would have to come from insurance. As discussed at length above, the insurance coverage in this case is limited, rapidly being consumed by legal fees, and at risk in light of potential competing claims, jurisdictional issues, and the carrier's uncertain financial and reinsurance situation. Thus, when judged against the realistic, rather than theoretical, potential for recovery after trial, the settlement amount is extremely beneficial.

In cases like these actions—where the risks and costs of litigation are great, where little if any additional recovery might be gained through litigation, and where the remaining insurance could be depleted or lost entirely, thereby potentially reducing the recovery available through litigation—the amount of "potential damages" does not preclude approval of a lesser settlement amount. The prompt, guaranteed payment of the settlement money increases the settlement's val-

ue in comparison to "some speculative payment of a hypothetically larger amount years down the road." *Teachers' Retirement Sys.*, 2004 WL 1087261, at *5.

For all of the foregoing reasons, the Court finds that the proposed partial settlement is fair, reasonable, and adequate.

**B. The Procedural Fairness of the Settlement**

▮ In addition to ensuring the substantive fairness of the settlement through full consideration of the *Grinnell* factors, the Court must also "ensure that the settlement is not the product of collusion." *In re NASDAQ Litig.*, 187 F.R.D. at 474. The Court makes this determination by analyzing the settlement negotiations "in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves." *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318, 2001 WL 709262, at *3 (S.D.N.Y. June 22, 2001). If the settlement is the result of arm's length negotiations conducted by experienced counsel after adequate discovery and the settlement provokes only minimal objections, then it is entitled to "[a] strong initial presumption of fairness." *Chatelain*, 805 F.Supp. at 212; *see Teachers' Retirement Sys.*, 2004 WL 1087261, at *1; *In re Holocaust Litigation*, 80 F.Supp.2d at 173–74. In addition to this presumption of fairness, " 'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation." *Maley*, 186 F.Supp.2d at 366 (citation and internal quotation marks omitted).

Since these cases were consolidated in March 6, 2002, counsel on both sides have conducted themselves professionally and have zealously advocated for the interests of their clients. Both sides have been represented well, and the Court has no objective or subjective reason to doubt the competence or zealousness of plaintiffs' attorneys. Counsel for plaintiffs, the Settling Defendants, and STB possessed the requisite expertise to negotiate a fair settlement. The negotiations among the settling parties and GX's insurers were protracted, adversarial, and intensive,

continuing over a 14–month period. Much of the settlement negotiation has occurred under the aegis of Magistrate Judge Dolinger, assigned to oversee the settlement negotiations in March 2003, whose oversight "help[ed] to ensure that the proceedings were free of collusion and undue pressure." *D'Amato,* 236 F.3d at 85.

It also is significant that, unlike in many other class actions, highly sophisticated governmental entities and attorneys participated in the settlement process and have approved the proposed settlement's terms. The provisions of the PSLRA provide additional guarantees of procedural fairness that are not present in class actions not covered by its terms. In the Securities Action, Lead Plaintiffs are financially sophisticated public entities represented by the Ohio Attorney General's Office as well as by Lead Counsel. In cases subject to the PSLRA, the lawyers representing a class are not mere entrepreneurs acting on behalf of purely nominal plaintiffs, but are lawyers selected by court-appointed Lead Plaintiffs who are substantial and sophisticated institutional investors with access to independent legal and financial specialists and a huge stake in the litigation. These various entities and counsel participated in negotiating the settlement, carefully reviewed the Agreement, and have advised the Court that the proposal fairly represents their interests.

In the ERISA Actions, there were similar procedural guarantors of the fairness of the settlement. The DOL reviewed the partial settlement and spoke in favor of it at the Fairness Hearing. An independent fiduciary appointed by the ERISA plans—Nell Hennessy, of Fiduciary Counselors, Inc.—also reviewed and approved the proposed settlement of the ERISA Actions. Under these circumstances, the likelihood of a collusive settlement between defendants and plaintiffs' lawyers at the expense of the plaintiff classes is drastically reduced. When the oversight of public bodies such as DOL and the active and patient participation of an experienced Magistrate Judge are also considered, the procedural guarantees of fairness here are quite substantial. The nature of the settle-

ment negotiations thus supports the Court's finding that the partial settlement did not result from collusion.

### III. *The Allocation Plans*

In approving an allocation plan, the Court must ensure that the distribution of funds is fair and reasonable. *Maley,* 186 F.Supp.2d at 367. When formulated by competent and experienced class counsel, an allocation plan need have only a "reasonable, rational basis." *In re Am. Bank Note Holographics, Inc. Sec. Litig.,* 127 F.Supp.2d 418, 429–30 (S.D.N.Y.2001). A reasonable plan may consider the relative strength and values of different categories of claims. *In re Lloyd's Am. Trust Fund Litig.,* No. 96 Civ. 1262, 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002).

#### A. The Securities Settlement

##### 1. The Allocation Plan

The allocation plan for the Securities Action shows that Securities Class Members will receive relief based on both the size and the character of their claims. The Securities Settlement Fund will be allocated 92% to GCL securities holders and 8% to AGC securities holders, with pro rata distributions based on the Recognized Claim formulae agreed to by the parties. Those formulas reflect differences based on the type of security involved and the timing of each Securities Class Member's investment decision. The plan recognizes "the relative damages suffered by the two groups of Class Members and the likelihood of recovery of each group in the event the case were to proceed to trial." (Securities Allocation Plan 1 (Liebesman Decl., Ex. D).) Such an allocation scheme is consistent with the manner in which other court-approved settlement funds have distributed settlement proceeds. Pro-rata distribution of settlement funds based on investment loss is clearly a reasonable approach. *See, e.g., Maley,* 186 F.Supp.2d at 367; *In re PaineWebber Litig.,* 171 F.R.D. at 135.[14]

---

14. Of course, nothing requires a settlement to benefit all class members equally. Such a rule would itself result in an inequitable windfall to certain class members, to the detriment of others. *See, e.g., In re PaineWebber Litig.,* 171 F.R.D. at 131.

### 2. Objection to Securities Allocation Plan

Securities Class Member Michael Myers has objected to the proposed allocation plan to the extent it would not grant relief to any Securities Class Member whose claim is valued at less than $10. This objection overlooks the undeniable fact that claims-processing costs money, which comes out of the settlement fund. Class counsel are entitled to use their discretion to conclude that, at some point, the need to avoid excessive expense to the class as a whole outweighs the minimal loss to the claimants who are not receiving their de minimis amounts of relief.

Any cash distribution from a settlement fund involves costs. The claims administrator incurs the expenses of cutting a check for each claimant; mailing the checks; canceling checks that were lost, misplaced, or never received, and reissuing checks to such claimants. All of those costs are charged to the settlement fund. (Supp. Garr Aff. ¶¶ 15–16.) Claimants who are entitled to receive only small settlement amounts can impose additional costs on the settlement fund, because such persons are less likely to cash their checks than are those claimants who receive larger amounts. The claims administrator therefore must incur additional expenses in contacting claimants who have not cashed their checks and urging them to do so. If the checks remain uncashed, the money must be reallocated to the other class members through second or third distributions, which create additional costs for the settlement fund. (*Id.* ¶¶ 15–17.)

GCG has opined that settlements that distribute checks for less than $10 require disproportionately more follow-up, have a disproportionately high number of uncashed checks, require more checks to be reissued, and often involve second or third distributions of settlement funds. Accordingly, GCG believes that a de minimis threshold of $10 is reasonable. (*Id.* ¶¶ 15, 17.) GCG also notes that it currently is administering 16 other securities cases with court-approved distribution plans involving de minimis thresholds of $10 or more. (*Id.* ¶¶ 12–13.)

These considerations, supported by the expert testimony of an experienced claims administrator, persuade the Court that Securities Lead Counsel acted reasonably in including a $10 de minimis threshold in the allocation plan, in order to preserve the settlement fund from excessive and unnecessary expenses in the overall interests of the class as a whole.

### B. The ERISA Allocation Plans

Like the securities allocation plan, the ERISA allocation plans allocate the settlement amount among plan participants based on their losses. There are no objections to the proposed ERISA allocation plans, and similar allocation plans have been approved in *Reinhart v. Lucent Technologies, Inc.,* No. 01–Cv–3491 (D.N.J. Mar. 15, 2004), and *In re Providian Fin. Corp. ERISA Litigation,* No. C–02–1001, 2003 WL 22005019 (N.D.Cal. June 30, 2003). (ERISA P. Mem. at 10.) The Court finds that the allocation plans are fair and reasonable.

### IV. *Insurance Payments*

█ The Settlement Agreement [§ XII.A.5, at 165–66] seeks entry of an Order stating that GX's insurers have not acted in bad faith and have fully discharged their policy obligations in making the agreed-upon payments into the settlement fund. The Court already has described GX's insurance policies, which GX purchased to provide coverage for its directors, officers, and other employees and also, in certain circumstances, for GX itself. Such policies could be considered property of the debtor's estate, because GX technically owned them. *See, e.g., MacArthur Co. v. Johns–Manville Corp.,* 837 F.2d 89, 92 (2d Cir.1988) ("a debtor's insurance policies are property of the estate"). However, even if the policies themselves might be estate property, the individual insureds (such as the Settling Defendants) have a right to use the policies' proceeds to cover their defense and settlement costs in litigation. *See, e.g., In re Adelphia Communications Corp.,* 298 B.R. 49, 52–54 (S.D.N.Y. 2003); *In re Daisy Sys. Sec. Litig.,* 132 B.R. 752, 755 (N.D.Cal.1991); *Ochs v. Lipson (In re First Central Fin. Corp.),* 238 B.R. 9, 13 (Bankr.E.D.N.Y.1999).

The Court understands that, to avoid any question about rights to insurance proceeds, GX's insurers regularly obtained the Bankruptcy Court's approval before paying out

insurance funds for GX's or the individual insureds' defense costs.[15] In its Preliminary Approval Order (¶ 8, at 19–22), this Court withdrew the references to the Bankruptcy Courts handling the GCL and AGC bankruptcies solely for the limited purpose of determining whether, in paying out the remaining insurance proceeds under the proposed settlement, the insurers will not be acting inconsistently with their contractual obligations, will be discharging their respective obligations to all insureds as to all past, present, and future claims, and will not be acting in bad faith.

The Court finds and concludes that the insurers would not be breaching any such duty or obligation in paying the insurance proceeds in connection with the proposed settlement. GX and the relevant insureds have expressly consented to the use of the insurance proceeds to fund the proposed settlement and have released the insurers from any further liability under the policies. In addition, GX's Estate Representative and Liquidating Trustees of GX's bankruptcy estate have supported the proposed settlement, including the exhaustion of all remaining insurance proceeds. (Ashton Decl. ¶¶ 21–22; Richman Decl., Ex. A.) Moreover, all but one of the insurers (Pender) are paying out their entire policy limits under the settlement, so no question could arise about their compliance with their obligations. And although Pender will not have paid all amounts conceivably available under the broadest possible reading of the policy (a reading that Pender disputes), the settling parties and Pender reached an agreement on the payment amount only after lengthy, intensive, and arduous negotiations. (Ashton Decl. ¶¶ 10–13, 25.) Under the circumstances, the Court finds that the insurers have not acted in bad faith or inconsistently with their policy obligations.

## V. *Attorneys' Fees and Expenses of Plaintiffs' Counsel and Lead Plaintiffs*

The GX Settlement awards $245 million for Securities Plaintiffs, of which $205 million is available for distribution to class members. GX Securities counsel seeks $38.4 million in fees, plus up to $2.9 million in costs, consistent with a retainer agreement between G & E and the Attorney General of the State of Ohio, on behalf of PERS and STRS (collectively "Ohio"). In the ERISA cases, the lawyers representing the plaintiffs in the 401(k) Actions have requested a total amount of $10.8 million in attorney fees; and counsel in the Consolidated Cases have requested a payment out of the ERISA settlement fund of compensatory awards to the three ERISA Consolidated Plaintiffs in the amount of $3,000 each. Several objections have been filed to the fee award.

### A. Securities Action

■ In March 2002, Ohio, along with the Office of the Attorney General of the State of Ohio ("AG's Office"), decided that PERS and STRS would seek appointment as lead plaintiffs and that Securities Lead Counsel would be retained to represent them. (Smith Decl. at ¶ 3 (Liebesman Decl. Ex. N); Eisenhofer Decl. ¶ 8 (Liebesman Decl. Ex. C).) After negotiating the terms of Securities Lead Counsel's representation, the AG's Office and Securities Lead Counsel executed a written agreement memorializing those terms in the Retainer Agreement, which was the result of extended arm's length negotiations between the AG's Office and Securities Lead Counsel. (Smith Decl. Ex. A ¶ 10 (Liebesman Decl. Ex. N).) The AG's Office and Securities Lead Counsel agreed upon a declining sliding scale of fees as follows:

| Amount of Recovery | Fee |
| --- | --- |
| $0—$150 million | 19% |
| $150 million—$300 million | 18% |
| $300 million—$400 million | 17% |
| Over $400 million | 15% |

(Smith Decl. Ex. A (Liebesman Decl. Ex. N).) The fee schedule is contingent on the amount of the recovery in the case. In addition, under the Retainer Agreement, Securities Lead Counsel is required to advance all of its expenses in the prosecution of the case.

---

**15.** The insurer providing the first layer of coverage filed a motion for approval to pay. GX did not oppose the motion, and the Bankruptcy Court granted it. *See, e.g., In re Global Crossing Ltd.,* Nos. 02–40187 through 02–40241(REG) (Bankr.S.D.N.Y. June 20, 2002). The Court understands that, as subsequent layers of insurance came on line, the insurers and GX stipulated to payment of defense costs, and the Bankruptcy Court approved the stipulations.

Reimbursement of these expenses is also contingent on a recovery. (*Id.*)

The work done by counsel in this case has been extensive, despite the fact that the Settling Defendants undertook to settle the case at an early procedural stage of the action. Prior to being appointed lead plaintiffs, Ohio actively investigated the alleged fraud in this case. With the assistance of two different private investigators, Securities Lead Counsel located and interviewed over 100 witnesses, mostly former GX employees, in the United States and abroad. (Eisenhofer Decl. ¶ 17 (Liebesman Decl. Ex. C).) Securities Lead Counsel's pre-appointment investigation resulted in Ohio's intervening in the GX bankruptcy court proceedings on two occasions, including an emergency motion prompted by a report of document destruction by a former GX employee contacted by Ohio. Ohio's pre-lead plaintiff appointment investigation also included a vast amount of document review and analysis, including such material as GX's filings with the Securities and Exchange Commission ("SEC") and press releases, published sources including analysts' reports concerning the telecommunication industry in general and GX in particular, the record compiled by congressional subcommittees, and documents filed in GCL's and AGC's bankruptcies, including filings of GX's creditors. (Eisenhofer Decl. at ¶ 16 (Liebesman Decl. ¶ Ex. C).)

As a result of Ohio's allegations of document destruction, a stipulated order was entered requiring GX to preserve documents for this litigation. In addition, GX disclosed the procedures it followed to collect and preserve documents since the commencement of this case to ensure that future document destruction would not occur, and GX agreed to collect personal documents from all of the Settling Defendants that had not already been collected by counsel. (*Id.* ¶ 22.) Ohio was also responsible for the service of at least 38 document preservation subpoenas to third parties, including financial institutions and telecom companies with whom GX had engaged in reciprocal transactions involving network capacity.

On January 28, 2003, Ohio filed the initial Complaint. That Complaint contained 326 pages of detailed allegations setting forth the fraudulent schemes involved in the case and reflected the exhaustive work conducted by Securities Lead Counsel. Many of the allegations in the Complaint were the direct result of Securities Lead Counsel's investigation over the prior eleven months. After the complaint was filed, Ohio negotiated an agreement with GX's officers and directors that provided Ohio complete access to GX's entire document production to the SEC and Congress, as well as documents produced by individual officers and directors. The documents included 270,000 pages of documents and over 80,000 e-mails. Many of the documents contained complex financial and technical information that had to be reviewed by various experts with accounting and telecom backgrounds. (*Id.* ¶ 41.) A substantial number of hours was spent reviewing and coding the documents by Securities Lead Counsel, members of the Securities Executive Committee, and their expert consultants.

Ohio spent more than a full year in truly arduous settlement negotiations with the Settling Defendants, the Settling Defendants' insurers and their reinsurers, STB, and the secured and unsecured creditors of GX. The parties involved in the settlement discussions were represented by prominent defense firms located in the United States and United Kingdom. The Settlement provides for Securities Lead Counsel to seek $38.4 million in fees and up to $2.9 million as reimbursement of expenses. The fee sought by Securities Lead Counsel is consistent with the terms of Ohio's retainer agreement with Securities Lead Counsel.

Where a party brings a private action resulting in the creation of a large fund for the benefit of a class, the costs of litigation, including attorneys' fees, are recoverable from the fund. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); *Mills v. Elec. Auto–Lite Co.*, 396 U.S. 375, 392–93, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Under the PSLRA, the Court has an independent obligation to ensure that the "[t]otal attorneys' fees and expenses awarded ... to counsel for the plaintiff class ... not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." 15 U.S.C. § 78u–4(a)(6); *see In re*

*Cendant Corp. Litig.,* 264 F.3d 201, 281–82 (3d Cir.2001). At the same time, in class action cases under the PSLRA, courts presume fee requests submitted pursuant to a retainer agreement negotiated at arm's length between lead plaintiff and lead counsel are reasonable. *In re Cendant Corp. Litig.,* 264 F.3d at 282. *Cendant's* presumption of reasonableness "ensure[s] that the lead plaintiff, not the court, functions as the class's primary agent vis-a-vis its lawyers." *Id.*

In this case, that presumption is particularly appropriate. Lead Counsel's application is based on a sliding scale set in a retainer agreement by sophisticated Lead Plaintiffs operating under the oversight of the Ohio Attorney General. The retainer agreement was negotiated at arm's length before this litigation commenced, when each party operated behind a veil of ignorance regarding how the case would ultimately fare. Moreover, the contingent nature of the recovery, negotiated by the client, served to minimize agency problems by giving counsel an incentive to seek the largest recovery possible.

Even apart from the presumption of fairness, however, the fees sought are reasonable. Courts use two methods to calculate attorneys' fees in common fund cases: (1) the percentage method, which awards attorneys' fees as a percentage of the common fund created for the benefit of the class, and (2) the lodestar/multiplier approach, which multiplies the number of hours expended by counsel by the hourly rate normally charged for similar work by attorneys of comparable skill and experience, and enhances the resulting lodestar figure by an appropriate multiplier to reflect litigation risk, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors. *See Goldberger,* 209 F.3d 43, 50 (2d Cir.2000); *Savoie v. Merchants Bank,* 166 F.3d 456, 460 (2d Cir.1999); *Maley,* 186 F.Supp.2d at 369–70. Although both methods are permissible, the trend in the Second Circuit is toward the percentage approach rather than the "cumbersome, enervating, and often surrealistic process" of evaluating fee petitions under the lodestar/multiplier approach. *See Indep. Energy Holdings Litig.,* 2003 WL 22244676, at \*5 n. 13. This ap-

proach aligns the class members' and class counsel's interests and moreover "provides a powerful incentive for the efficient prosecution and early resolution of litigation." *In re Lloyd's Am. Trust Fund,* 2002 WL 31663577, at \*25. It also mirrors commonplace fee arrangements between private litigants and their attorneys in the marketplace, including the arrangement actually entered by the parties here. *In re Sumitomo Copper Litig.,* 74 F.Supp.2d 393, 397 (S.D.N.Y.1999)

But no matter which method is chosen—percentage or lodestar/multiplier—the fees awarded in common fund cases must be "reasonable" under the circumstances. *Goldberger,* 209 F.3d at 47. The Second Circuit has instructed that in exercising discretion to approve an award in attorneys fees, a district court "should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Id.* at 50 (citation omitted, ellipses in original). In applying these criteria, "a Court essentially makes no more than a qualitative assessment of a fair legal fee under all the circumstances of the case." *Union Carbide,* 724 F.Supp. at 166. The requested fee award is warranted and reasonable under the six *Goldberger* criteria.

The cumulative lodestar for the services performed by Securities Lead Counsel, the Executive Committee and counsel for the named plaintiffs ("Class Counsel") in this action is $17.89 million. In addition, Class Counsel has incurred unreimbursed expenses in the amount of $3,081,139.12, for which they are seeking reimbursement of $2.9 million. These expenditures were critical to Securities Lead Plaintiffs' success in achieving the Settlement.

The first *Goldberger* factor—the time and effort expended by counsel—is easily satisfied. The combined lodestar of Class Counsel of over $17.8 million represents over 45,000 hours of attorney and paralegal time, and is plainly reasonable. The enormous

effort that yielded the extraordinary $245 million cash Settlement was necessary because of the accounting complexities of the case, the challenge of constructing and prosecuting claims against the Settling Defendants and STB with various responsibilities at GX, and the challenge of extracting a significant recovery from individuals whose collective assets were insignificant as compared to the $35.5 billion in losses allegedly sustained by the Securities Class. Moreover, Securities Lead Counsel prosecuted the case in a coordinated and well-organized fashion to ensure efficiency and minimize unnecessary duplication of work. (*See* Eisenhofer Decl. ¶ 91 (Liebesman Decl. Ex. C).) Securities Lead Counsel pursued this case intensely for over two years on an entirely contingent basis. The contingent nature of Securities Lead Counsel's representation is a key factor in determining a reasonable award of attorneys' fees. *Grinnell,* 495 F.2d at 470.

The second *Goldberger* factor—the magnitude and complexity of the case—also supports the requested fee award. Here, GX is alleged to have artificially generated billions of dollars in illegitimate revenues via IRU sales and reciprocal transactions. Much of the alleged wrongdoing centers on accounting violations and the improper application of GAAP. Moreover, liability in this case could be established only by examining GX's business models that were used to justify the IRU sales and reciprocal transactions, the mental state of GX's employees who developed and executed the IRU sales and reciprocal transactions, and the motivation behind the third-parties that assisted GX with the IRU sales and reciprocal transactions.

The Second Circuit has identified "the risk of success as 'perhaps the foremost' factor to be considered in determining" a reasonable award of attorneys' fees. *Goldberger,* 209 F.3d at 54. "[L]itigation risk must be measured as of when the case is filed," rather than with the hindsight benefit of subsequent events. *Id.* at 55. From the outset, as fully discussed above, this case presented significant litigation, collectability, and contingency risks.

The fourth *Goldberger* factor—the result achieved and the quality of legal services provided—also supports the fee award. The quality of Securities Lead Counsel's representation is evidenced by the recovery obtained for the Securities Class—not less than approximately $205 million of the total $245 million Settlement, in cash and plus interest. This Settlement: (1) is among the top ten largest securities class action settlements obtained since the passage of the PSLRA; (2) far exceeds the average recovery in securities class action litigation; (3) includes a $30 million contribution from Winnick that appears to be the largest ever paid by an individual defendant in a securities fraud class action; and (4) includes $19 million from STB.

Another indication of the quality of the result achieved is the fact that the Settlement will provide compensation to the Securities Class expeditiously. Without the Settlement, protracted litigation would require large expenditures of time and money for scores of depositions, massive document productions, discovery disputes, dispositive motions and pre-trial motions and a trial, followed by post-trial appeals of any favorable jury verdict for the Securities Plaintiffs. *See Weinberger,* 698 F.2d at 73.

Finally, "[t]he quality of opposing counsel is also important in evaluating the quality of plaintiffs' counsels' work." *In re Warner Communications Sec. Litig.,* 618 F.Supp. 735, 749 (S.D.N.Y.1985), *aff'd,* 798 F.2d 35 (2d Cir.1986). Here, Securities Lead Counsel obtained the Settlement in the face of vigorous opposition by defendants who were represented by some of the nation's leading law firms, including Debevoise & Plimpton, Christensen Miller, and Davis Polk & Wardwell. Settling Defendants' legal fees, totaling over $40 million (Lead P. Mem. at 25), also provide a reasonable index of the extent and value of the services of plaintiffs' counsel.

The fifth *Goldberger* factor—the relation of the requested fee to the Settlement—also supports the requested fee. The fee sought by Securities Lead Counsel is less than 19% of the portion of the Settlement expected to be paid to the Class and 16% of the total Settlement value. (Eisenhofer Decl. ¶ 5.) Securities Lead Counsel's requested fee is also consistent with fee awards in common fund cases in the Second Circuit and across the nation. Even in cases where the court applies the percentage method of fee calcula-

**468**

tion, documentation of hours remains a useful "cross-check" on the reasonableness of the requested percentage. *Goldberger,* 209 F.3d at 50. Nevertheless, "where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court. Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case...." *Id.* (internal citation omitted).

Under the lodestar method of fee computation, a multiplier is typically applied to the lodestar. The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors. *See Goldberger,* 209 F.3d at 47; *Savoie,* 166 F.3d at 460. Class Counsel's lodestar is $15.1 million, and the 19%–18% sliding scale fee requested represents a modest multiplier of 2.16. (Eisenhofer Decl. ¶ 89 (Liebesman Decl. Ex. C).)

Securities Lead Counsel's fee request passes the lodestar cross-check for a number of reasons. First, the more than 45,000 hours invested by Securities Lead Counsel and the other Class Counsel are reasonable in view of the work performed. Second, Securities Lead Counsel's hourly rates are comparable to those normally charged by attorneys of similar skill and experience in the legal community. *See Savoie,* 166 F.3d at 460. Third, the lawyers involved have a record of successfully representing investors in securities class actions. (*See* Eisenhofer Decl. ¶ 13.) Finally, the requested 2.16 multiplier falls comfortably within the range of lodestar multipliers and implied lodestar multipliers used for cross-check purposes in

common fund cases in the Southern District of New York. *See Maley,* 186 F.Supp.2d at 368–69 (awarding multiplier of 4.65).[16]

■ Class Counsel has incurred out-of-pocket expenses in the amount of $3.081 million. In accordance with the Settlement Agreement, Securities Lead Counsel requests reimbursement at this time for expenses in the amount of $2.9 million, which is less than the actual expenses incurred in the prosecution of this case. The expenses incurred—which include investigative and expert witnesses, filing fees, service of process, travel, legal research and document production and review—are the type for which "the paying, arms' length market" reimburses attorneys. For this reason, they are properly chargeable to the Settlement fund. *See, e.g., TBK Partners, Ltd. v. Warshow,* Nos. 77 Civ. 972, 77 Civ. 1897, 1977 WL 1047, at *3 (S.D.N.Y Oct. 5, 1977) (court noted that in securities actions, "[o]f course, [plaintiffs' counsel] are also entitled to reimbursement for their expenses.").

B. ERISA Actions
 1. Attorneys' Fees and Expenses

Pursuant to the common fund doctrine, the lawyers representing the plaintiffs in the ERISA Actions have requested a total amount of $10.8 million in attorney fees, $395,124.75 in expenses, and leave to request additional expenses incurred in implementing the settlement. This application for an award of attorneys' fees and expenses covers all counsel in the ERISA Actions, both the ERISA Consolidated Action (No. 02 Civ. 7453) and the *Pusloskie* action (No. 02 Civ. 8508).[17]

---

**16.** Professors Geoffrey Miller of the New York University School of Law and Arthur R. Miller of Harvard Law School, both of whom have significant expertise in securities class action settlements and attorney fee awards, studied the Settlement and the fee request. Both have concluded that the Settlement is fair, reasonable and adequate and that a 19%–18% sliding scale fee award of $38.4 million to Securities Lead Counsel comports with controlling case law and is consistent with awards in comparable common fund cases. (Arthur Miller Decl. ¶¶ 2, 33; Geoffrey Miller Decl. ¶¶ 3, 53.) The fee agreement between Securities Lead Counsel and Ohio "is prima facie evidence of the reasonableness of a fee calculated according to its terms." (Geoffrey Miller Decl. ¶ 24.) "This is precisely

the type of bargaining that the PSLRA anticipated and to which a court reasonably may give substantial deference." (Arthur Miller Decl. ¶ 25.) Both professors noted that the fee sought is well within the range of reasonableness when compared to other securities settlements. (*Id.* ¶ 33; Geoffrey Miller Decl. ¶ 53.)

**17.** An unresolved issue exists between ERISA Consolidated Counsel and *Pusloskie* Lead Counsel with respect to the apportionment, if any, of the aggregate fee and expense award between the two participant classes, the participants in the Global Crossing Employees' Retirement Savings Plan and the participants in the Frontier Group Bargaining Unit Employees' Retirement Savings Plan. This issue does not affect the total

■ Common fund awards are appropriate in 401(k) and other ERISA class action litigation to the same extent as in any other type of litigation. *E.g., In re Providian ERISA Litig.,* 2003 WL 22005019 (ERISA 401(k) company stock case); *Kolar v. Rite Aid Corp.,* No. Civ.A. 01–1229, 2003 WL 1257272 (E.D.Pa. Mar. 11, 2003) (same); *In re Lucent Tech. Sec. Litig.,* 327 F.Supp.2d 426 (D.N.J.2004) (awarding fees in settlement of securities and ERISA cases under common fund doctrine); *see also Great Neck Capital Appreciation P'ship v. Pricewaterhouse Coopers, L.L.P.,* 212 F.R.D. 400 (E.D.Wis.2002) (ERISA 401(k) objectors paid pursuant to common fund doctrine for carve-out of ERISA claims from securities settlement); *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043 (9th Cir.2002) (ERISA entitlement class action); *Berger v. Xerox Corp. Ret. Income Guarantee Plan,* No. 00–584, 2004 WL 287902 (S.D.Ill. Jan. 22, 2004) (ERISA cash balance class action); *Millsap v. McDonnell Douglas Corp.,* No. 94 Civ. 633, 2003 WL 21277124 (N.D.Okla.2003) (ERISA § 510 class action). In this case, ERISA Lead Counsel successfully negotiated a settlement payment by the defendants and their insurers for the ERISA class members of approximately $78 million. This settlement amount qualifies as a "common fund," and ERISA Lead Counsel are entitled to a share of the fund under the common fund doctrine.

■ As stated above, in the Second Circuit, the District Court has discretion in a common-fund case to calculate the attorneys' fees based on either the percentage-of-the-fund or lodestar/multiplier method, but in this District the great weight of authority supports basing common-fund awards on a percentage of the gross recovery. *See, e.g., In re Indep. Energy Sec. Litig.,* 2003 WL 22244676; *In re Sumitomo Copper Litig.,* 74 F.Supp.2d at 397; *In re NASDAQ Litig.,* 187 F.R.D. at 484; *In re Presidential Life Sec. Litig.,* 857 F.Supp. 331, 334 (S.D.N.Y.1994); *Chatelain,* 805 F.Supp. at 215. The Court elects to use the common fund method here.

■ The fees requested here, $10.8 million, are less than 15% of the entire $78 million fund and only slightly more than 15% of the fund net of the various reserves. This amount is reasonable in light of: the size of the fund created and the number of persons benefitted; the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; the skill and efficiency of the attorneys involved; the risk of non-payment; the amount of time devoted to the case by plaintiff's counsel; the awards in similar cases; and public policy considerations. *See* MANUAL FOR COMPLEX LITIGATION § 24.121 (3d ed.1995); *see also In re Union Carbide Corp. Litig.,* 724 F.Supp. 160, 163 (S.D.N.Y. 1989). Of particular importance, neither the DOL nor the independent fiduciary had any objection to the requested award, and only one class member has objected. That objection, moreover, is not to the size of the request but to the inclusion of the Winnick contribution in the fund for the calculation of the fee. Because by any measure the fee is less than 25% of the fund,[18] the Court need not decide whether the Winnick contribution should or should not be treated as part of the fund.

Here the lodestar, as reflected in the time records submitted to the Court, is approximately $4.2 million. This yields a multiplier of approximately 2.6. Given the novelty and the riskiness of the case, this multiplier is certainly justified. Based on all these factors and the lodestar cross-check, the Court approves the requested fees of $10.8 million.

Counsel are entitled to be reimbursed for the reasonable expenses advanced in class litigation. *See Miltland Raleigh–Durham v. Myers,* 840 F.Supp. 235, 239 (S.D.N.Y.1993). These expenses incurred to date total $381,543 for ERISA Consolidated Counsel (detailed in the Sarko Declaration and its attachments) and $13,582 for *Pusloskie* counsel. In addition, counsel estimate that between $2,500 and $10,000 of additional expenses will be incurred to implement the

---

amount of fees and expenses requested, and has been referred to Judge Dolinger for resolution.

**18.** Net of the amount contributed to the ERISA settlement by Winnick, the fees are 20% of the

fund. Net of the reserves and the Winnick contribution (part of which must be allocated to the reserves), the fees are still less than 25% of the fund.

settlement. Those expenses will be submitted to the Court in a supplemental application.

The requested expenses are reasonable, and the Court awards the requested amounts. Counsel may file a supplemental application for expenses pursuant to the Court's continuing jurisdiction to administer the settlement.

### 2. ERISA Lead Plaintiffs' Fees and Expenses

In the ERISA Consolidated Cases, counsel have also requested a payment out of the ERISA settlement fund of compensatory awards to the three ERISA Consolidated Plaintiffs in the amount of $3,000 each. These modest requests are appropriate under Second Circuit law, *see Dornberger v. Metropolitan Life Ins. Co.*, 203 F.R.D. 118 (S.D.N.Y. 2001) (reviewing case law supporting awards from $2,500 to $85,000), and the Court approves it. No such fees are requested in the *Pusloskie* case.

### 3. *Simonetti* Action

Pursuant to the Common Fund Doctrine, the firm representing the Plaintiffs in the *Simonetti* action has requested a total of $190,000.00 in attorney's fees and $8,880.12 in expenses, and leave to request additional expenses incurred in implementing the settlement. The fees requested here, $190,000.00, are approximately 19% of the entire $1 million fund. The amount is reasonable in the light of the factors addressed above. *See* MANUAL FOR COMPLEX LITIGATION § 24.121. Neither the DOL nor the independent fiduciary had any objection to the requested award. Here the lodestar, as reflected in the time records submitted to the Court, is approximately $133,000.00. This yields a multiplier of approximately 1.5. Given the novelty and the risks of the case, this multiplier is justified. Based on all these factors and the lodestar cross-check, the Court approves the requested fee of $190,000.00. The reasonable expenses incurred to date total $8,880.12. In addition, counsel estimates that between $1,000.00 and $2,000.00 of additional expenses will be incurred to implement the settlement. Those amounts will be submitted to the Court in a supplemental application. The requested expenses are reasonable, and the Court awards the requested amounts. Counsel may file a supplemental application for expenses pursuant to the Court's continuing jurisdiction to administer the settlement.

### CONCLUSION

This partial settlement is comprehensive in its scope, fair and even-handed in its application, and of substantial economic benefit to the Class Members. The Court therefore approves the partial settlement as fair, reasonable and adequate, finally certifies the Classes as defined in the Final Judgment and the Approval Order, and awards plaintiffs' counsel their attorneys' fees and expenses.

SO ORDERED.